**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 31, 2002**

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v                             No. 118181

MARCEL R. RIDDLE,

    Defendant-Appellant.

_____

BEFORE THE ENTIRE BENCH

YOUNG, J.

    We granted leave in this case to consider whether defendant is entitled to the reversal of his convictions of second-degree murder[1] and possession of a firearm during the commission of a felony (felony-firearm)[2] on the ground that

_____

[1]MCL 750.317.

[2]MCL 750.227b.

the trial court denied his request for a jury instruction that he was not required to retreat before exercising deadly force in self-defense while in his yard. We affirm.

## I. Introduction

The prosecution contends that Michigan law generally imposes a "duty to retreat" upon a person who would exercise deadly force in self-defense, and that the so-called "castle doctrine"–providing an exception to this duty to retreat when a person is attacked within his dwelling–does not extend to the area outside the dwelling. Defendant, on the other hand, contends that the castle doctrine should be extended to the curtilage and that he was not required to retreat when he was assaulted in his backyard.

Because Michigan's case law has become somewhat confused with respect to the concepts of retreat and the castle doctrine, we take this opportunity to clarify these principles as they apply to a claim of self-defense. We reaffirm today the following, according to the common-law principles that existed in Michigan when our murder statute was codified.

As a general rule, the killing of another person in self-defense by one who is free from fault is justifiable homicide if, under all the circumstances, he honestly and reasonably believes that he is in imminent danger of death or great bodily harm and that it is necessary for him to exercise

2

deadly force.[3] The necessity element of self-defense normally requires that the actor try to avoid the use of deadly force if he can safely and reasonably do so, for example by applying nondeadly force or by utilizing an obvious and safe avenue of retreat.[4]

There are, however, three intertwined concepts that provide further guidance in applying this general rule in certain fact-specific situations. First, a person is *never* required to retreat from a sudden, fierce, and violent attack; nor is he required to retreat from an attacker who he reasonably believes is about to use a deadly weapon.[5] In these circumstances, as long as he honestly and reasonably believes that it is necessary to exercise deadly force in self-defense, the actor's failure to retreat is never a consideration when determining if the necessity element of self-defense is satisfied; instead, he may stand his ground and meet force with force.[6] That is, where it is uncontested

---

[3]See *People v Heflin*, 434 Mich 482, 502-503; 456 NW2d 10 (1990) (opinion by RILEY, C.J.); *People v Lennon*, 71 Mich 298, 300-301; 38 NW 871 (1888).

[4]*Pond v People*, 8 Mich 150, 176 (1860); *People v Doe*, 1 Mich 451, 455-456 (1850).

[5]*Doe, supra* at 455-456; *People v Macard*, 73 Mich 15, 21-22; 40 NW 784 (1888).

[6]*People v Kuehn*, 93 Mich 619, 621-622; 53 NW 721 (1892); *Macard, supra* at 21-22; *Brownell v People*, 38 Mich 732, 738 (1878); *People v Lilly*, 38 Mich 270, 276 (1878); *Patten v*
(continued...)

that the defendant was the victim of a sudden and violent attack, the Court should not instruct the jury to consider whether retreat was safe, reasonable, or even possible, because, in such circumstances, the law does not require that the defendant engage in such considerations.[7]

Second, Michigan law imposes an *affirmative obligation to retreat* upon a nonaggressor[8] only in one narrow set of circumstances: A participant in voluntary mutual combat will not be justified in taking the life of another until he is deemed to have retreated as far as safely possible.[9]  One who

---

[6](...continued)
*People*, 18 Mich 313, 330-331 (1869).

[7]See *Beard v United States*, 158 US 550, 564; 15 S Ct 962; 39 L Ed 1086 (1895)*,* stating that the victim of a sudden and violent attack is "not obliged to retreat, nor to consider whether he could safely retreat . . . ."

Where, on the other hand, a factual issue has been presented for the jury's resolution concerning the circumstances under which the defendant used deadly force—as is true in the case at bar—the jury should be instructed concerning all relevant principles for which evidentiary support exists.

[8]We are not concerned in this case with the use of deadly force by one who is an initial aggressor (i.e., one who is the first to use deadly force against the other), as such a person is generally not entitled to use deadly force in self-defense. See *Heflin*, *supra* at 502-503; *People v Townes*, 391 Mich 578; 218 NW2d 136 (1974); Perkins & Boyce, Criminal Law (3d ed), pp 1121, 1129-1133.  The principles articulated in this opinion apply solely to those who are otherwise privileged to exercise deadly force in self-defense.

[9]See *People v Lenkevich*, 394 Mich 117, 120-121; 229 NW2d 298 (1975); *Pond, supra* at 174-175.

is involved in a physical altercation in which he is a willing participant-referred to at common law as a "sudden affray" or a "chance medley"-is *required* to take advantage of any reasonable and safe avenue of retreat before using deadly force against his adversary, should the altercation escalate into a deadly encounter.

Third, regardless of the circumstances, one who is attacked in his dwelling is *never* required to retreat where it is otherwise necessary to exercise deadly force in self-defense. When a person is in his "castle," there is no safer place to retreat; the obligation to retreat that would otherwise exist in such circumstances is no longer present, and the homicide will be deemed justifiable. This is true even where one is a voluntary participant in mutual combat.[10] Because there is no indication that this "castle doctrine" extended to outlying areas within the curtilage of the home at the time of the codification of our murder statute, however, we decline defendant's invitation to extend the doctrine in this manner; we hold instead that the doctrine is limited in application to the home and its attached appurtenances.[11]

---

[10]See *Pond, supra* at 176.

[11]We specifically do not address whether a person may exercise deadly force in defense of his habitation, and our holding should not be misconstrued to sanction such use of force as it pertains to the defense of one's habitation. Rather, we hold only that a person is not obligated to retreat
(continued...)

## II. FACTUAL AND PROCEDURAL BACKGROUND

On the evening of August 15, 1997, defendant and two friends, Robin Carter and James Billingsley, convened at defendant's home. The three men were in the backyard just outside defendant's house, in the driveway near a detached garage, when defendant shot Carter in the legs eleven times with an automatic carbine rifle. After shooting Carter, defendant immediately drove to the Detroit River, where he disposed of the rifle. Carter, who did not have a weapon in his possession, was resuscitated at the scene but died as a result of the gunshot wounds three days later.

Although the facts in the preceding recitation are undisputed, at defendant's trial on charges of first-degree murder[12] and felony-firearm the prosecution and the defense presented different versions of the events leading to the shooting. Billingsley testified for the prosecution that after Carter made a disparaging comment about defendant's fiancée, defendant went into the house, came back outside armed with a rifle, and began firing at Carter. Billingsley stated that Carter was not armed and did not approach

---

[11](...continued)
in his dwelling or its attached appurtenances before exercising deadly force in self-defense if he honestly and reasonably believes that he is in imminent danger of death or serious bodily harm. See n 3.

[12]MCL 750.316.

defendant when he came out of the house with the weapon. Defendant, on the other hand, testified that he intervened in an argument between Carter and Billingsley and that he told Carter, whom he considered to be "the more aggressive one," to leave. Seeing a "dark object" in Carter's hand and believing it to be a gun, defendant immediately reached for his rifle, which he testified was in his detached garage. Defendant stated that he aimed the rifle at Carter's legs and pulled the trigger, intending only to scare him.

Defendant requested that the jury be instructed, pursuant to CJI2d 7.17, that there is no duty to retreat in one's own home before exercising self-defense.[13] The prosecution objected, contending that the instruction was not appropriate because the shooting took place outside the home, in the curtilage. Although defendant attempted to withdraw his request for CJI2d 7.17, the trial court proceeded to rule that the instruction was not appropriate under the circumstances of

---

[13]CJI2d 7.17 provides:

If a person [assaulted the defendant in the defendant's own home / forcibly entered the defendant's home], the defendant did not have to try to retreat or get away. Under those circumstances, the defendant could stand [his] ground and resist the [attack / intrusion] with as much force as [he] honestly and reasonably believed necessary at the time to protect [himself].

7

the case.[14]   The trial court instead instructed the jury, in

accordance with CJI2d 7.16, as follows:

> By law, a person must avoid using deadly force if he can safely do so.  If the defendant could have safely retreated but did not do so, you can consider that fact along with all the other circumstances when you decide whether he went farther in protecting himself than he should have.
>
> However, if the defendant honestly and reasonably believed that it was immediately necessary to use deadly force to protect himself from an [imminent] threat of death or serious injury, the law does not require him to retreat. He may stand his ground and use the amount of force he believes necessary to protect himself.[15]

The jury returned a verdict of guilty of the lesser offense of

second-degree murder and guilty as charged of felony-firearm.

In his appeal before the Court of Appeals, defendant

argued that the trial court improperly denied his request for

a "no duty to retreat" instruction.  The Court of Appeals

panel examined this Court's decisions in *Pond v People*, 8 Mich

150 (1860), and *People v Lilly*, 38 Mich 270 (1878), and held

that defendant had a duty to retreat if safely possible before

exercising deadly force to repel an attack unless he was

inside his dwelling or an inhabited outbuilding within the

curtilage.  Because the shooting occurred within the curtilage

---

[14]We assume, therefore, for purposes of this opinion that defendant's claim of error was properly preserved, despite counsel's offer to withdraw the request for CJI2d 7.17.

[15]The jury was also given the general self-defense standard jury instruction, CJI2d 7.15.

but not in an inhabited outbuilding, the panel opined, the trial court properly refused to instruct the jury that defendant had no duty to retreat. Unpublished opinion per curiam, issued October 13, 2000 (Docket No. 212111).

We granted leave to appeal, limited to the issue whether the trial court committed error requiring reversal in denying defendant's request to instruct the jury concerning the lack of a duty to retreat. 465 Mich 884 (2001). Because we conclude that the trial court did not err, we affirm defendant's convictions.

### III. STANDARD OF REVIEW

We are required in this case to determine under what circumstances a defendant must retreat before exercising deadly force in self-defense. This presents a question of law, which we review de novo. *People v Hamilton*, 465 Mich 526, 529; 638 NW2d 92 (2002); *People v Layher*, 464 Mich 756, 761; 631 NW2d 281 (2001).

A criminal defendant is entitled to have a properly instructed jury consider the evidence against him. *People v Rodriguez*, 463 Mich 466, 472; 620 NW2d 13 (2000); *People v Mills*, 450 Mich 61, 80-81; 537 NW2d 909 (1995). When a defendant requests a jury instruction on a theory or defense that is supported by the evidence, the trial court must give the instruction. *Rodriguez*, supra at 472-473; *Mills*, *supra* at

9

81. However, if an applicable instruction was not given, the defendant bears the burden of establishing that the trial court's failure to give the requested instruction resulted in a miscarriage of justice. MCL 769.26; *Rodriguez*, supra at 473-474; *People v Lukity*, 460 Mich 484, 493-494; 596 NW2d 607 (1999). The defendant's conviction will not be reversed unless, after examining the nature of the error in light of the weight and strength of the untainted evidence, it affirmatively appears that it is more probable than not that the error was outcome determinative. MCL 769.26; *Rodriguez*, supra at 474; *Lukity*, supra at 495-496.

### IV. ANALYSIS

#### A. PRINCIPLES OF CONSTRUCTION

Because Michigan's homicide statutes proscribe "murder" without providing a particularized definition of the elements of that offense or its recognized defenses,[16] we are required to look to the common law at the time of codification for guidance. See Const 1963, art 3, § 7;[17] *People v Couch*, 436

---

[16]The Legislature has bifurcated all murder offenses into first-degree murder, MCL 750.316, and second-degree murder, MCL 750.317. The statutory description of these offenses has changed little since the first Penal Code was enacted in 1846. See *People v Couch*, 436 Mich 414, 418-421; 461 NW2d 683 (1990) (opinion by BOYLE, J.).

[17]"The common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended
(continued...)

10

Mich 414, 418-421; 461 NW2d 683 (1990). Where a statute employs the general terms of the common law to describe an offense, courts will construe the statutory crime by looking to common-law definitions. See *Couch*, *supra* at 419, quoting *Morissette v United States*, 342 US 246, 263; 72 S Ct 240; 96 L Ed 288 (1952):

> "[W]here [a legislature] borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them."

The criminal law, as defined at common law and codified by legislation, "should not be tampered with except by legislation," and this rule applies with equal force to common-law terms encompassed in the defenses to common-law crimes. *In Re Lamphere*, 61 Mich 105, 109; 27 NW 882 (1886). Therefore, because our Legislature has not acted to change the law of self-defense since it enacted the first Penal Code in 1846, we are proscribed from expanding or contracting the defense as it existed at common law.[18] We therefore apply the

_____

[17](...continued)
or repealed."

[18]Thus, although we are certainly not oblivious to various policy concerns that might otherwise affect our analysis were
(continued...)

11

common law as it was understood when the crime of murder was codified to clarify the concepts of retreat and the castle doctrine.

### B. SELF-DEFENSE AND RETREAT

### 1. GENERALLY APPLICABLE RULES

At common law, a claim of self-defense, which "is founded upon necessity, real or apparent," may be raised by a nonaggressor as a legal justification for an otherwise intentional homicide.  40 Am Jur 2d, Homicide, § 138, p 609.  When a defendant accused of homicide claims self-defense,

> [t]he question to be determined is, did the accused, under all the circumstances of the assault, as it appeared to him, honestly believe that he was in danger of [losing] his life, or great bodily harm, and that it was necessary to do what he did in order to save himself from such apparent threatened danger? [*People v Lennon*, 71 Mich 298, 300-301; 38 NW 871 (1888).]

Thus, the killing of another person in self-defense is justifiable homicide only if the defendant honestly and reasonably believes his life is in imminent danger or that there is a threat of serious bodily harm and that it is necessary to exercise deadly force to prevent such harm to himself.  See *People v Daniels*, 192 Mich App 658, 672; 482 NW2d 176 (1991).

---

[18](...continued)
we not constrained to apply MCL 750.317 to the facts of the case before us, we leave the task of rendering such policy judgments to the Legislature.

We reaffirm today that the touchstone of *any* claim of self-defense, as a justification for homicide, is *necessity.* An accused's conduct in failing to retreat, or to otherwise avoid the intended harm, may in some circumstances–other than those in which the accused is the victim of a sudden, violent attack–indicate a lack of reasonableness or necessity in resorting to deadly force in self-defense. For example, where a defendant "invites trouble" or meets non-imminent force with deadly force, his failure to pursue an available, safe avenue of escape might properly be brought to the attention of the factfinder as a factor in determining whether the defendant acted in reasonable self-defense.[19]

However, as Judge Cardozo cautioned in *People v Tomlins*, 213 NY 240, 245; 107 NE 496 (1914), "[g]eneral statements to the effect that one who is attacked should withdraw, must be read in the light of the facts that led up to them." Thus,

---

[19]See *People v Walters*, 223 Mich 676, 682-683; 194 NW 538 (1923) (jury was properly instructed that killing was not justifiable if the defendant "renewed the affray" after the deceased abandoned it); *People v Meert*, 157 Mich 93, 95, 100-101; 121 NW 318 (1909) (opining that the defendant, who carried a revolver to a saloon because he "was expecting" that he would encounter his victim there, did not act reasonably when he walked up to the victim and shot him because "[r]eady means of escape were at hand . . . and no danger was to be apprehended"); *People v Robinson*, 152 Mich 41, 47; 115 NW 997 (1908) (instruction that the defendant, who assaulted a man in a barroom, had a duty to "retire" if he could safely do so unless he was attacked with a deadly weapon or was in the defense of property or others did not constitute error requiring reversal because the defendant was in a place of perfect safety when he assaulted the victim).

the generally applicable element of necessity contemplates three reticulate rules that are applicable in certain specific factual scenarios.

### 2.   THREE DEPARTURES FROM THE GENERAL RULE OF NECESSITY

#### a.   NO DUTY TO RETREAT FROM SUDDEN, VIOLENT ATTACK

Although Michigan's common law that was codified imposes a duty to avoid using deadly force, it is clear that retreat is never required in circumstances similar to those delineated in *Beard v United States*, 158 US 550; 15 S Ct 962; 39 L Ed 1086 (1895),[20] the classic American "no duty to retreat" case: when a person is violently attacked and it does not reasonably appear that it would be safe to retreat.

The statement of the governing principles of self-defense as set forth in *People v Doe*, 1 Mich 451, 456-457 (1850), is indicative of the common-law rules that were in place when the Legislature enacted Michigan's murder statutes just four years earlier.  These principles remain apropos today and have not

---

[20]

> [If a] defendant . . . had at the time reasonable grounds to believe, and in good faith believed, that the deceased intended to take his life, or do him great bodily harm, *he was not obliged to retreat, nor to consider whether he could safely retreat, but was entitled to stand his ground, and meet any attack made upon him with a deadly weapon*, in such way and with such force as, under all the circumstances, he, at the moment, honestly believed, and had reasonable grounds to believe, were necessary to save his own life, or to protect himself from great bodily injury. [*Beard, supra* at 564 (emphasis supplied).]

14

been modified since their implicit codification more than 150 years ago:

> *First*.  That a man who, in the lawful pursuit of his business, is attacked by another under circumstances which denote an intention to take away his life, or do him some enormous bodily harm, may lawfully kill the assailant, *provided he use all the means in his power, otherwise, to save his own life or prevent the intended harm; such as retreating as far as he can, or disabling his adversary without killing him, if it be in his power*.[21]

> *Secondly*.  When the attack upon him is so *sudden, fierce and violent*, that a retreat would not diminish, but increase his danger, *he may instantly kill his adversary without retreating at all*.

> *Thirdly*.  When from the nature of the attack, there is reasonable ground to believe that there is a design to destroy his life, or commit any felony upon his person, the killing of the assailant will be excusable homicide, although it should afterwards appear that no felony was intended. [Emphasis supplied.]

The rules of self-defense as provided in *Doe* state the obvious: If it is possible to safely avoid an attack then it is not *necessary*, and therefore not permissible, to exercise deadly force against the attacker.  However, one is never obliged to *retreat* from a sudden, fierce, and violent attack, because under such circumstances a reasonable person would, as a rule, find it necessary to use force against force without retreating.  The violent and sudden attack removes the ability

---

[21]Thus, where a threatened attack is not *imminent*, the person being threatened may not lawfully exercise deadly force in self-defense.

to retreat.[22]  Where immediate danger to life or great bodily

harm is threatened upon the innocent victim, he "cannot be

required when hard pressed, to draw very fine distinctions

concerning the extent of the injury that an infuriated and

reckless assailant may probably inflict."  *People v Brownell*,

38 Mich 732, 738 (1878).  As Justice Holmes reasoned in *Brown*

*v United States*, 256 US 335, 343; 41 S Ct 501; 65 L Ed 961

(1921), "detached reflection cannot be demanded in the face of

an uplifted knife."  There, Justice Holmes concluded that "it

is not a condition of immunity that one in that situation

should pause to consider whether a reasonable man might not

think it possible to fly with safety . . ."  *Id.*, citing *Rowe*

*v United States*, 164 US 546, 558; 17 Sup Ct 172; 41 L Ed 547

(1896).[23]

---

[22]To hold that an innocent person has a duty to retreat
in the face of a violent assault would be tantamount to
holding such a person "responsible for having brought . . .
necessity upon himself, on the sole ground that he failed to
fly from his assailant when he might have safely done so[.]"
*Erwin v State*, 29 Ohio St 186, 199 (1876).  Indeed, the
possibility of safe retreat cannot serve as a factor in
determining the gravity or mortality of the peril.  To so hold
would be to require that the assailed "avoid the necessity by
retreating before his assailant."  *Palmer v State*, 9 Wy 40; 59
P 793, 795 (1900).

[23]Similarly, Wharton stated: "A man can only kill in self-
defense from necessity, whether he has a right to stand his
ground, or it is his duty to retreat; but in the one case he
can have that necessity determined in view of the fact that he
has a right to stand his ground, and on the other hand [where
he is involved in the sudden affray] he must show, as one
feature of the necessity, that he has retreated to the wall."
(continued...)

16

In *People v Macard*, 73 Mich 15; 40 NW 784 (1888), this Court reaffirmed that Michigan never recognized at common law an obligation to retreat from a sudden and violent attack before codification. In *Macard*, the defendant and his neighbor had a history of mutual animosity. The defendant was standing in or near a public road in front of his home when his neighbor began advancing toward him from across the street, carrying a gun and making threats. When the neighbor continued to advance despite the defendant's warning that he stop, the defendant shot him. At his trial for murder, the defendant asserted self-defense and argued that retreating would have exposed him to greater danger. This Court reversed the defendant's conviction of manslaughter and granted him a new trial on the basis that the trial court erred in instructing the jury that the defendant was justified in shooting "'[i]f there was no reasonable opportunity or means of avoiding what the [defendant] anticipated as an assault with this deadly weapon":

> Go which way [the defendant] would, he would only the more surely expose himself to the deadly aim of his antagonist. In such case, about the only question for the jury to determine was, did the [defendant] in good faith believe this to be his true situation? If he did, the jury should have been told [he] was fully justified. . . . To hold otherwise would be to destroy the right of self-defense. *It was not necessary for the*

---

[23](...continued)
Wharton, Homicide (3d ed), § 298, p 478.

*[defendant], if without fault, on being suddenly assaulted by the use of a deadly weapon upon the public highway or upon his own premises, to retreat before using his weapon.* An instant of delay might have been at the expense of his life, and the law requires no man to run such risks. [*Id.* at 21-22 (emphasis supplied).]

### b. THE DUTY TO RETREAT: SUDDEN AFFRAY OR CHANCE MEDLEY

Michigan law imposes an *affirmative obligation* to retreat, where safely possible, in one narrow set of circumstances: where a defendant—who is not in his "castle"—is voluntarily engaged in mutual, nondeadly combat that escalates into sudden deadly violence. This represents the *only* type of situation in which the English common law imposed upon a defender an affirmative duty to "retreat to the wall," *Pond, supra* at 174-175; *Erwin, supra* at 195; Perkins & Boyce, Criminal Law (3d ed), pp 1121-1123, 1126, and it is apparent from our case law that Michigan adhered to this rule at the time of the codification of our murder statute.

As explained by Professors Perkins and Boyce, by reference to Foster, Crown Law (1762), the use of deadly force in self-defense at English common law was considered in light of the different positions of the parties involved. The first scenario involved a defendant who was without fault:

One, entirely free from fault, is the victim of an assault which was murderous from the beginning. He is under no obligation to retreat . . . but may stand his ground, and *if he reasonably believes it necessary to use deadly force to save himself from death or great bodily harm, he is*

18

*privileged to do so.* [Perkins & Boyce, *supra* at 1121 (emphasis supplied).]

Thus, at common law the innocent victim of a murderous assault had no affirmative duty to retreat; instead, if he reasonably believed that it was necessary under the circumstances to exercise deadly force, he could kill his assailant in self-defense. This rule is consistent with the generally applicable rules of self-defense as codified in Michigan's murder statutes, as discussed above. See *Macard*, *supra* at 21-22; *Lennon*, *supra* at 300-301; *Brownell*, *supra* at 738; *Pond*, *supra* at 177-178.

However, an affirmative obligation to retreat applied to a voluntary participant in mutual combat:

> One who was the aggressor in a chance-medley (an ordinary fist fight, or other nondeadly encounter), or who culpably entered into such an engagement, finds that his adversary has suddenly and unexpectedly changed the nature of the contest and is resorting to deadly force. *This . . . is the only type of situation which requires "retreat to the wall."* Such a defender, not being entirely free from fault, must not resort to deadly force if there is any other reasonable method of saving himself. Hence if a reasonable avenue of escape is available to him he must take it *unless he is in his "castle"* at the time. [Perkins & Boyce, *supra* at 1121 (emphasis supplied).]

Thus, the original concept of a "'duty to retreat to the wall' applied not to the innocent victim of a murderous assault, but only to the culpable participant of a chance-medley." Perkins

19

& *Boyce*, *supra* at 1225.[24]  This principle was recognized by this Court in *Pond*, *supra* at 175-176:

> In [cases in which a defensive homicide occurred in a sudden affray], the original assault not being with a felonious intent, and the danger arising in the heat of blood on one or both sides, the homicide is not excused unless the slayer does all which is reasonably in his power to avoid the necessity of extreme resistance, by retreating where retreat is safe, or by any other expedient which is attainable.  He is bound, if possible, to get out of his adversary's way, and has no right to stand up and resist if he can safely retreat or escape.

Accordingly, we conclude that at the time of the codification of our first murder statute in 1846, the common-law rule in Michigan recognized only one instance in which an affirmative, specific duty to retreat applied, namely, when the defendant was the voluntary participant in mutual combat.[25]

### c.   The "Castle" Doctrine

#### i.   Retreat is Not a Factor in One's Dwelling

It is universally accepted that retreat is not a factor in determining whether a defensive killing was necessary when

---

[24]It appears clear enough to us that "[c]ourts which adopted [a] 'no-retreat rule' [were] frequently under the false impression that this required departure from the English common law."  Perkins & Boyce, *supra* at 1137.

[25]Perkins refers to a third situation that is not relevant to the matter at hand: "One who starts an encounter with a murderous assault upon another, or who willingly engages in mutual combat with malice aforethought . . . has forfeited all right of self-defense during that contest."  Perkins & Boyce, *supra* at 1121.  That is consistent with the Michigan rule that one who is an aggressor may not avail himself of the defense. See *Heflin, supra* at 509.  See also n 8.

it occurred in the accused's dwelling:

> Regardless of any general theory to retreat as far as practicable before one can justify turning upon his assailant and taking life in self-defense, the law imposes no duty to retreat upon one who, free from fault in bringing on a difficulty, is attacked at or in his or her own dwelling or home. Upon the theory that a man's house is his castle, *and that he has a right to protect it and those within it from intrusion or attack*, the rule is practically universal that when a person is attacked in his own dwelling he may stand at bay and turn on and kill his assailant if this is apparently necessary to save his own life or to protect himself from great bodily harm. [40 Am Jur 2d, § 167, p 636.]

The rule has been defended as arising from "'an instinctive feeling that a home is sacred, and that it is improper to require a man to submit to pursuit from room to room in his own house.'" *People v Godsey*, 54 Mich App 316, 319; 220 NW2d 801 (1974) (citations omitted). Moreover, in a very real sense a person's dwelling is his primary place of refuge. Where a person is in his "castle," there is simply *no safer place* to retreat.

### ii. THE REACH OF THE CASTLE DOCTRINE

Defendant, who was outside his home in the driveway or yard between the home and a detached garage at the time of the homicide, contends that he was wholly excused from any obligation to retreat because he was in his "castle." We disagree and hold that the castle doctrine, as it applied in this state and as was codified in our murder statute in 1846, applies solely to the dwelling and its attached appurtenances.

21

Although many courts have extended the castle exception to other areas,[26] we conclude that there is simply no basis in the case law of this state, contemporaneous with the enactment of our initial murder statute, to justify extending the rule in this manner.

It is unknown whether the English common law applied the castle doctrine—which, as we have noted, was relevant only to the voluntary participant in a nondeadly encounter—to areas beyond the dwelling. As noted by Professors Perkins and Boyce, "the scope of [the] special privilege granted to one so far at fault might have been limited to the actual building [but this] is mere speculation." *Id*. at 1134-1135. Because the only indication we have of the castle doctrine as it applied in Michigan at the time of the codification of our murder statute is that it applied *"in the dwelling," Pond,*

---

[26]The majority of jurisdictions employing the castle doctrine have extended the doctrine to the curtilage surrounding the home. See Dressler, Understanding Criminal Law (3d ed), § 18.02[C][3], p 228. The doctrine has also been extended in several jurisdictions to numerous areas away from the dwelling: cars, businesses, and homes owned by third parties, to name a few. Because the Legislature codified the common-law rules as they existed in 1846, this Court has no authority to act on different policy determinations concerning the expansion of the castle doctrine. Thus, we leave it to the Legislature to decide whether there are other places in which a defendant's failure to retreat cannot be considered as a factor in determining whether it was necessary for him to exercise deadly force in self-defense. We note that many states have legislatively addressed the self-defense and retreat issues that are presented in this case. See, e.g., Model Penal Code, § 3.04; Ala Code, § 13A-3-23 (1982); Conn Gen Stat, § 53a-19.

*supra* at 176 (emphasis supplied), we lack the authority to now extend this rule to areas beyond "the dwelling" itself.

Defendant contends that this Court's statements in *Pond* indicate that Michigan's common law extended the castle doctrine to the curtilage surrounding the home.  However, we agree with the prosecution's contention that *Pond* did not in any way purport to extend the self-defense castle exception to the curtilage area surrounding the dwelling.[27]  With respect to self-defense, this Court explained in *Pond* that

> [t]he danger resisted must be to life, or of serious bodily harm of a permanent character; and it *must be unavoidable by other means*.  Of course, we refer to means within the power of the slayer, so far as he is able to judge from the circumstances as they appear to him at the time.

---

[27]The *Pond* Court held that, for the purpose of the defendant's claim that he killed the victim in resisting a violent and forcible felony upon a dwelling, an outlying net-house was "a dwelling or part of the dwelling" of the defendant because it was near the dwelling house and was used as a permanent dormitory for his servants.  *Id.* at 181-182; see also *id.* at 164-167.  Because this Court considered the net-house to be a dwelling not for the purpose of the self-defense castle doctrine but instead for the purpose of a completely different defense, this holding is not relevant to our inquiry.  Moreover, whether this outlying *building* would have been considered a "dwelling" for the purpose of self-defense is not an inquiry that aids us in determining whether the castle doctrine applies to open areas within the curtilage.  Because the Court of Appeals cited *Pond* for the proposition that the self-defense castle exception–providing that no person is required to retreat within his dwelling before exercising self-defense–extends to "inhabited outbuildings," we wish simply to point out that (1) *Pond* does not stand for this proposition and (2) as the case at bar does not involve an inhabited *outbuilding*, we need express no opinion concerning whether the castle doctrine would apply to such a building.

> *A man is not, however, obliged to retreat if assaulted in his dwelling*, but may use such means as are absolutely necessary *to repel the assailant from his house, or to prevent his forcible entry*, even to the taking of life. But here, as in the other cases, he must not take life if he can otherwise arrest or repel the assailant. [Emphasis supplied.]

This statement of the castle rule, taken from a case issued quite contemporaneously with the enactment of our murder statute, provides no basis from which to conclude that the rule applied anywhere but "in [the] dwelling," that is, an inhabited building and its attached appurtenances.[28]

*Pond*, therefore, does not allow us to conclude that the castle doctrine, so far as it was a part of the common law of this state when our murder statute was enacted, extended to the curtilage surrounding the dwelling. Instead, by providing essentially the sole indication, contemporaneous with the enactment of the murder statute, concerning whether and to what extent any duty to retreat existed in our common law, *Pond* establishes that the castle doctrine applies in this State only to a residence. Thus, for example, while the castle doctrine applies to all areas of a dwelling–be it a

---

[28]Contemporaneous dictionary definitions wholly support our conclusion. See, e.g., Worcester, *Dictionary of the English Language* (Brewer and Tileston, 1864), defining "dwelling" as "[h]abitation; place of residence; residence; abode; dwelling-place"; *Webster's American Dictionary of the English Language* (1828) (accord); *The Oxford English Dictionary* (1989), providing examples of the usage of the word "dwelling" from the years 1340 through 1863 as meaning "[a] place of residence; a dwelling-place, habitation, house."

room within the building, a basement or attic, or an attached appurtenance such as a garage, porch or deck—it does *not* apply to open areas in the curtilage that are not a part of a dwelling.

Defendant additionally argues that *Lilly* provides a basis for extending the castle exception to the curtilage. In *Lilly*, the defendant was attacked at night on his property in a passageway between his house and a new house that he was constructing. The defendant stabbed and killed the attacker, a farmhand whom he had recently discharged and who had earlier that day threatened the defendant with extreme personal violence. At the defendant's trial for murder, the trial court instructed the jury as follows:

> "If you find that . . . [the defendant] could have saved himself from all serious harm by retreating or calling for assistance, and the defendant so knew or believed, but that he did not do so; but stood his ground and resisted [the farmhand], and in such resistance killed [him], such killing would not be justifiable or excusable.

> "If [the defendant] believed that [the farmhand] came to his premises on the evening of the homicide with the intention of seeking a combat with him, and that he sought him for that purpose and the defendant so knew, then it was [the defendant's] duty to have avoided [him], and to have avoided such combat by all reasonable means within his power, and if he chose to stand up and resist the assault when he might have avoided it, . . . such killing would not be justifiable." [*Id.* at 275.]

This Court set aside the defendant's conviction for manslaughter and ordered a new trial, holding that the jury

25

instructions improperly suggested to the jury that the facts would warrant findings that were not supported by the evidence, "especially that defendant did not make reasonable efforts to avoid deceased and avert his attack." *Id.* Furthermore, this Court held, the instructions were improper because they

> indicated to the jury . . . [that] it was incumbent upon [the defendant] to fly from his habitation where his wife and children were, in order to escape danger instead of resisting the aggressor. Such is not the law. The jury should have been instructed in effect that if they were satisfied that [the defendant] being at his own house had reason to believe and did believe from [the farmhand's] previous and present language, manner and actions, and what had already taken place, that it was necessary to inflict the wounds he did inflict . . . to save his own life or to protect himself from danger of great bodily harm, he was excused.
>
> . . . The charge was inconsistent with the view here explained, and it conveyed the idea that if help was within call and that defendant so believed, then his act was not lawful self-defense. [*Id.* at 275-276.]

We do not agree with defendant's assertion that *Lilly* abrogates the necessity element of self-defense where the accused kills an assailant within the curtilage of his dwelling. Instead, *Lilly* reaffirms that the fundamental inquiry with respect to a claim of self-defense is whether the defendant reasonably believed that it was *necessary* to utilize deadly force against his aggressor. *Lilly* further establishes that the defendant was not required to leave his premises-

thereby subjecting his wife and children to danger in his absence—or to seek aid from third parties. *Lilly* simply did not involve the castle exception.

In short, there is no basis in our case law for supposing that Michigan ever recognized an extension of the doctrine beyond the inhabited "dwelling" itself at the time the common-law rules were codified. Instead, we adhere to this Court's formulation of the doctrine in *Pond*, *supra* at 176, that "[a] man is not . . . obliged to retreat if assaulted *in his dwelling*" (emphasis supplied). Thus, the castle doctrine is relevant only to acts of self-defense that take place in the dwelling; the doctrine has no application to "a conflict outside the home." *People v Stallworth*, 364 Mich 528*,* 535; 111 NW2d 742 (1961).[29]

### C.  APPLICATION

In this case, defendant requested that the jury be instructed in accordance with CJI2d 7.17, which is titled "No Duty to Retreat While in Own Dwelling" and which provides that a person assaulted in his own home does "not have to try to

---

[29]Accordingly, in *Stallworth*, this Court held that the jury's rejection of the defendant's claim of self-defense, resulting in a verdict of guilty of manslaughter, was not against the great weight of the evidence where there was testimony that the killing took place on the sidewalk outside the defendant's dwelling: This testimony portrayed "a conflict *outside the home* where it would have been possible for the jury to conclude that defendant *might have retreated* to avoid further trouble." *Id.* at 535 (emphasis supplied).

27

retreat or get away," but may "stand his ground and resist the attack." The trial court denied defendant's request and instead instructed the jury in accordance with CJI2d 7.16, which is titled "Duty to Retreat to Avoid Using Deadly Force." We hold that defendant was not entitled to the requested instruction. Defendant was not in his dwelling or an attached appurtenance when he killed Carter. He was outside his home in the yard.

Nevertheless, as we have explained, defendant was entitled to an instruction that adequately conveyed to the jury that he was not required to retreat if it was *necessary* for him to exercise deadly force under the circumstances as they reasonably appeared to him. While we suggest that CJI2d 7.16 be revised to further comport with the principles expressed in this opinion, the language of the instruction accurately conveyed to defendant's jury that the baseline inquiry is *necessity*:

> By law, a person must avoid using deadly force if he can safely do so. If the defendant could have safely retreated but did not do so, you can consider that fact along with all the other circumstances when you decide whether he went farther in protecting himself than he should have.
>
> However, *if the defendant honestly and reasonably believed that it was immediately necessary to use deadly force to protect himself from an [imminent] threat of death or serious injury, the law does not require him to retreat.* He may stand his ground and use the amount of force he believes necessary to protect himself.

This instruction was properly given under the circumstances of this case. Pursuant to this instruction, the jury was permitted only to consider whether defendant could have *safely* retreated under the circumstances as they reasonably appeared to him. The second portion of this instruction further emphasized that there is never a duty to retreat if the accused reasonably and honestly believes that he is in imminent harm and that it is necessary to exercise deadly force.[30] Moreover, the jury was given a comprehensive general self-defense instruction (CJI2d 7.15) that further explained the relevant principles and additionally permitted the jury to "consider how the excitement of the moment affected the choice the defendant made" in exercising deadly force.

## V. CONCLUSION

We hold that the cardinal rule, applicable to *all* claims of self-defense, is that the killing of another person is

---

[30]There might be circumstances in which an instruction permitting the jury to consider a defendant's failure to retreat would be improper; for instance, if the defendant was inside his dwelling when he was attacked or if the undisputed evidence established that he was suddenly and violently attacked. See, e.g., *Macard*, *supra*. In such a case there would be no basis for an instruction allowing the defendant's failure to retreat to be considered in determining whether he acted in lawful self-defense. In the instant case, the parties disputed whether defendant had any reason whatsoever to believe that he was in danger. Thus, it was properly within the province of the jury to determine whether defendant honestly and reasonably believed that it was necessary to exercise deadly force.

justifiable homicide if, under all the circumstances, the defendant honestly and reasonably believes that he is in imminent danger of death or great bodily harm and that it is necessary for him to exercise deadly force. As part and parcel of the "necessity" requirement that inheres in every claim of lawful self-defense, evidence that a defendant could have safely avoided using deadly force is normally relevant in determining whether it was *reasonably necessary* for him to kill his assailant. However, (1) one who is without fault is *never* obligated to retreat from a sudden, violent attack or to retreat when to do so would be unsafe, and in such circumstances, the presence of an avenue of retreat cannot be a factor in determining necessity; (2) our law imposes an affirmative "duty to retreat" only upon one who is at fault in voluntarily participating in mutual nondeadly combat; and (3) the "castle doctrine" permits one who is within his dwelling to exercise deadly force even if an avenue of safe retreat is available, as long as it is otherwise reasonably necessary to exercise deadly force.

Defendant was not entitled to a "castle exception" instruction in this case because he was in his yard and not in his dwelling when he used deadly force. However, defendant was entitled to an instruction that adequately conveyed to the jury that, although he was required to avoid using deadly force if possible, he had no obligation to retreat if he

30

honestly and reasonably believed that he was in imminent danger of great bodily harm or death and that it was necessary to use deadly force in self-defense. The standard jury instruction that was given adequately imparted these principles. Accordingly, we vacate the decision of the Court of Appeals in part and affirm defendant's convictions for the reasons expressed in this opinion.

CORRIGAN, C.J., and WEAVER, TAYLOR, and MARKMAN, JJ., concurred with YOUNG, J.

CAVANAGH and KELLY, JJ., concurred in the result only.