*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

SCOTT ROBERT RADLEY,

Defendant-Appellant.

UNPUBLISHED
July 27, 2023

No. 361883
Macomb Circuit Court
LC No. 2021-000478-FC

Before: CAMERON, P.J., and BORRELLO and O'BRIEN, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions of two counts of assault with intent to commit great bodily harm less than murder (AWIGBH), MCL 750.84(1)(a);[1] carrying a dangerous weapon with unlawful intent, MCL 750.226; and malicious destruction of personal property worth $1,000 or more but less than $20,000, MCL 750.377a(1)(b)(*i*). Defendant was sentenced to 34 to 120 months' imprisonment for each of his AWIGBH convictions, 34 to 60 months' imprisonment for his carrying a dangerous weapon with unlawful intent conviction, and 34 to 60 months' imprisonment for his malicious destruction of property conviction, with his sentences to be served concurrently. For the reasons set forth in this opinion, we affirm.

## I. BACKGROUND

Late one night, defendant and his friends decided to return to the home of the victims to get revenge following an earlier disagreement and altercation involving defendant, defendant's friends, and the two victims in this case. Defendant, Joseph McMath, Victoria Niner, Alaysia Morgan, and Alyssa Hoffman drove to the home where the victims, Bradley Keats and Bernard Shillinger lived. There was testimony that the original plan was to slash the tires of some vehicles at the house or confront Keats. Defendant and McMath were each armed with a knife. When they

---

[1] Defendant was charged with, and tried on, two counts of assault with intent to commit murder (AWIM), MCL 750.83; but was acquitted of those charges and convicted of the lesser included offenses of AWIGBH.

arrived at the house, defendant and McMath got out of the vehicle. After slashing the tires of Keats' vehicles, as well as smashing the windows and committing other damage to the exteriors of the vehicles that amounted to over $1,700 in damage, defendant and McMath fled.

Keats came out of the house wielding a baseball bat and chased after them. McMath fell, and Keats caught up to him. A fight between the two ensued. McMath testified that Keats put him in a headlock. McMath testified that while he was grappling with Keats, neither he nor Keats had a weapon because McMath had dropped his knife and Keats had dropped his bat. Keats testified that he dropped the bat before he began wrestling with McMath. According to Keats, he wrestled with McMath for a few seconds and then felt something like being hit in the back. He later realized he had been stabbed. Shillinger and his girlfriend, Diane Elrod,[2] testified that they could see the fight from the house and saw someone come up behind Keats or from on top of Keats while he was on the ground and make a stabbing motion toward Keats. Shillinger ran out of the house toward the fight. Keats let go of McMath, Shillinger arrived, and defendant and McMath ran away. According to Shillinger, McMath ran away first and defendant turned around and told Shillinger, "You can die too." Shillinger testified that at that point, defendant stabbed him and then fled.

There was some discrepancy whether Keats ever hit McMath with the bat. McMath testified that although he did not ever see Keats swing the bat at him, his head starting bleeding and Keats might have hit him with the bat. There was evidence that McMath initially told police that he was hit with the bat three times but subsequently admitted that he did not know if he was hit with the bat after the interviewing officer told him that his injuries did not appear consistent with being hit by a baseball bat three times. Apparently, McMath had been told by defendant that Keats hit McMath with the baseball bat. Neither Shillinger nor Elrod saw Keats swing the bat at McMath.

After defendant and McMath fled from the scene of the stabbing, they were picked up in the vehicle that Hoffman was driving. Morgan and Niner were also still in the vehicle. Morgan testified that when defendant got into the vehicle, he said that he thought he killed Keats by stabbing him three times. It was Morgan's understanding that defendant was trying to stop Keats from hurting McMath. Niner similarly testified that defendant got into the vehicle and said, "I killed him." According to Niner, defendant reported that he stabbed both victims and that McMath had fallen and was being hit with a bat by Keats. Hoffman also testified that when defendant got into the car, he said he had killed Keats. Hoffman recalled defendant specifically explaining that he knew how to kill someone and had stabbed Keats in the lungs and kidney. Hoffman also recalled that defendant said that he did not mean to kill Keats, that he thought Keats was going to kill McMath, and that he was only trying to help McMath.

Defendant and McMath were eventually apprehended by the police. The victims were taken to the hospital to be treated for their injuries. Keats had stab wounds to his back, the back of his head, and the front of his chest. He was bleeding profusely. There was testimony that before Keats was taken to the hospital by ambulance, his chest wound was treated at the scene with a "chest seal," which is a special type of bandage used to protect against the possibility of collapsed

---

[2] Elrod referred to Shillinger as her husband but stated that the two were not legally married.

lungs in cases of penetrating injuries to the chest cavity such has the stab wound Keats had suffered. At the hospital, his head and back wounds were stapled or stitched closed, and exploratory surgery was performed on his chest cavity to ensure that he did not have any injuries to vital organs. It turned out that the penetrating wound in his chest was within approximately half an inch of his heart and lung, and within approximately an inch and a half of his "main intestine." Keats was determined to be in stable but critical condition at some point, and he then was determined to be in good condition following his surgery. Keats remained at the hospital overnight. Shillinger had a stab wound in his shoulder. At the hospital, his wound was cleaned before Shillinger was sent home the same night.

Following a jury trial, defendant was convicted and sentenced as previously noted. This appeal followed. Further facts necessary to the resolution of the issues on appeal will be discussed as necessary below.

## II. JURY INSTRUCTION AND JUDICIAL BIAS

Defendant contends a curative instruction given by the trial court to strike a question asked by defense counsel had the effect of denigrating defense counsel in front of the jury in a manner that deprived defendant of a fair trial.

During cross-examination of Shillinger, he indicated in response to defense counsel's questioning that he had been staying at Keats's house for "[m]aybe a month or two, something like that." Defense counsel subsequently asked Shillinger, "So, is there a reason you didn't update your address on the sex offender registry you moved?" The prosecution immediately objected and the jury was excused from the courtroom. After taking a break to allow the parties to research the issue, taking further testimony from Shillinger outside the presence of the jury about his reporting obligations, and hearing argument from the parties, the trial court sustained the prosecution's objection and ruled that the question would be stricken because it implied that Shillinger was obligated to do something that he was not required to do and the question therefore was inappropriate and should not have been asked. The trial court instructed the jury as follows:

> The last question that was asked from the defense was completely inappropriate and it must be stricken. It implied something this witness was not obligated to do, and it should not have been asked. It should not be discussed in your deliberations, or in any way be considered in your rendering of a verdict.

On appeal, defendant does not claim that the trial court erred by excluding the evidence, striking the question, or ruling that defendant's proposed line of questioning was inadmissible. Rather, defendant argues that the trial court's curative instruction to the jury was so strongly worded that it disparaged defense counsel. Defendant contends that the instruction disparaged defense counsel by implying that defense counsel had committed some form of ethical breach or serious misconduct and that the instruction improperly influenced the jury to defendant's detriment.

"The question whether judicial misconduct denied defendant a fair trial is a question of constitutional law that this Court reviews de novo." *People v Stevens*, 498 Mich 162, 168; 869 NW2d 233 (2015).

A trial judge's conduct deprives a party of a fair trial if the conduct pierces the veil of judicial impartiality. A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party. In evaluating the totality of the circumstances, the reviewing court should inquire into a variety of factors including, but not limited to, the nature of the trial judge's conduct, the tone and demeanor of the judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions, either at the time of an inappropriate occurrence or at the end of trial. [*Id.* at 164.]

Beginning with the nature of the trial judge's conduct, the instruction informed the jurors that defense counsel's question about Shillinger's status as sex offender was improper and that they should not consider it in their deliberations. In doing so, the trial judge informed the jury that the question was inappropriate and should not have been asked. "Judicial misconduct may come in myriad forms, including belittling of counsel, inappropriate questioning of witnesses, providing improper strategic advice to a particular side, biased commentary in front of the jury, or a variety of other inappropriate actions." *Id.* at 172-173. Here, over the objection of defense counsel, the trial court essentially adopted the prosecution's proposed curative instruction. "Judicial rulings, as well as a judge's opinions formed during the trial process, are not themselves valid grounds for alleging bias 'unless there is a deep-seated favoritism or antagonism such that the exercise of fair judgment is impossible.' " *People v Jackson*, 292 Mich App 583, 598; 808 NW2d 541 (2011) (citation omitted). "A single inappropriate act does not necessarily give the appearance of advocacy or partiality, but a single instance of misconduct may be so egregious that it pierces the veil of impartiality." *Stevens*, 498 Mich at 171. "Comments that are critical of or hostile to counsel and the parties are generally not sufficient to pierce the veil of impartiality." *Jackson*, 292 Mich App at 598.

The trial court's curative instruction in this case focused on the propriety of the question defense counsel had asked. It was not personally directed at defense counsel, and we fail to see how the instruction belittled or directly disparaged defense counsel. Defendant's appellate argument relies entirely on speculation about how the instruction could have *potentially* been understood to imply misconduct on the part of defense counsel, but defendant has not provided any evidence to show that the trial court held a deep-seated antagonism toward defendant or defense counsel. *Id.* The nature of the conduct does not weigh in favor of concluding that the judge pierced the veil of impartiality.

The remaining *Stevens* factors also do not weigh in favor of concluding that the trial judge pierced the veil of impartiality. It is difficult, from the textual record, to discern the trial judge's "tone and demeanor" when providing the curative instruction. Considering there is a presumption of judicial impartiality, *id.*, there seems to be no indication the trial judge was overly emotional or spoke in an unfairly critical tone when offering the instruction. Further, "the scope of the judicial conduct" was a single curative instruction during a seven-day trial. *Stevens*, 498 Mich at 164. The trial court's instruction was directed at the defense, but only because defense counsel asked an improper question. *Id.* There was no immediate curative instruction about the trial judge's

instruction because none was requested. *Id*. However, the trial court's final instructions included the following instruction to the jury:

> [W]hen I make a comment or given an instruction, I am not trying to influence your vote or express a personal opinion about the case. If you believe that I have an opinion about how you should decide this case, you must pay no attention to that opinion. You are the only judges of the facts, and you should decide this case from the evidence.

"Because [i]t is well established that jurors are presumed to follow their instructions, a curative instruction will often ensure a fair trial despite minor or brief inappropriate conduct." *Stevens*, 498 Mich at 177 (quotation marks and citation omitted; alteration in original).

Based on our consideration of the record and the *Stevens* factors, we conclude that the veil of judicial impartiality was not pierced in this case because under the totality of the circumstances, it is not reasonably likely that the curative instruction at issue somehow "improperly influenced the jury by creating the appearance of advocacy or partiality" against defendant. *Id*. at 164.

## III. SUFFICIENCY OF THE EVIDENCE

Next, defendant challenges the sufficiency of the evidence supporting his AWIGBH convictions.[3]

"We review de novo a challenge on appeal to the sufficiency of the evidence." *People v Henry*, 315 Mich App 130, 135; 889 NW2d 1 (2016) (quotation marks and citation omitted). "To determine whether the prosecutor has presented sufficient evidence to sustain a conviction, we review the evidence in the light most favorable to the prosecutor and determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Smith-Anthony*, 494 Mich 669, 676; 837 NW2d 415 (2013) (quotation marks and citation omitted). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Bailey*, 310 Mich App 703, 713; 873 NW2d 855 (2015) (quotation marks and citation omitted).

---

[3] Although defendant states in his appellate brief that the "verdict was not supported by the weight of the evidence," defendant only cites legal rules related to challenging the sufficiency of the evidence. Defendant does not cite any legal authority related to asserting an argument that the verdict was against the great weight of the evidence. Accordingly, we understand defendant's argument to be solely one challenging the sufficiency of the evidence. Any attempt to raise a great-weight argument has been abandoned. See *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998) ("An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority."). Defendant does not challenge the sufficiency of the evidence regarding his other convictions.

On appeal, defendant argues that his AWIGBH convictions must be reversed because the evidence at trial established that he acted in lawful defense of McMath to protect McMath's life.

Our Supreme Court has explained that the common-law defense-of-others doctrine is similar to "its more popular sibling, self-defense." *People v Leffew*, 508 Mich 625, 638; 975 NW2d 896 (2022). "Under the defense-of-others doctrine, [o]ne may use force in defense of another when he or she reasonably believes the other is in immediate danger of harm and force is necessary to prevent the harm; deadly force is permissible to repel an attack which reasonably appears deadly." *Id.* (quotation marks and citation omitted). "Traditionally, the 'defense of others' concept applied solely to those persons with whom the defendant had a special relationship, such as a wife or brother." *People v Kurr*, 253 Mich App 317, 321; 654 NW2d 651 (2002); see also *Leffew*, 508 Mich at 638-639. However, the defense-of-others doctrine has evolved over time to extend to strangers, drawing no distinction in its application between defense of relatives and defense of strangers. *Leffew*, 508 Mich at 638-639; *Kurr*, 253 Mich App at 321.

The defense of others constitutes an affirmative defense that may be raised to excuse or justify the commission of otherwise criminal acts, such as the assaultive conduct at issue in this case. See *Leffew*, 508 Mich at 638-643 (explaining that defense of others may be raised as an affirmative defense to excuse both assaultive and nonassaultive conduct); see also *Kurr*, 253 Mich App at 321 ("Case law in Michigan also allows a person to use deadly force in defense of another."). " 'Once a defendant satisfies the initial burden of producing some evidence from which a jury could conclude that the elements necessary to establish a prima facie defense of [defense of others] exist, the prosecution bears the burden of disproving the affirmative defense of [defense of others] beyond a reasonable doubt.' " *Leffew*, 508 Mich at 644, quoting *People v Dupree*, 486 Mich 693, 712; 788 NW2d 399 (2010) (alterations in original).

Here, defendant argues that his actions were necessary to defend McMath because Keats was assaulting McMath with a baseball bat. However, there was testimony at trial that Keats had dropped the baseball bat and was not using it to assault McMath. There was further testimony that there were no weapons involved while McMath and Keats were wrestling with each other. Additional testimony was introduced that defendant, who was armed with a knife, came up behind Keats and stabbed him, after which defendant also stabbed Shillinger.

The defense-of-others affirmative defense is ultimately predicated on the concept that a person is authorized to use only that degree of force *reasonably necessary* to stop the attack on the third person. See *Leffew*, 508 Mich at 638 ("Under the defense-of-others doctrine, [o]ne may use force in defense of another when he or she reasonably believes the other is in immediate danger of harm and force is *necessary* to prevent the harm; deadly force is permissible to repel an attack which reasonably appears deadly.") (quotation marks and citation omitted; alteration in original; emphasis added); 2 LaFave, Substantive Criminal Law (3d ed), § 10.5(b), pp 223-224 ("As with self-defense, so too with the defense of another, one is not justified in using force to protect the other unless he reasonably believes that the other is in immediate danger of unlawful bodily harm and that force is necessary to prevent that harm; and even when he entertains these reasonable beliefs, *he may not use more force than he reasonably believes necessary to relieve the risk of harm.*") (emphasis added); cf also *People v Riddle*, 467 Mich 116, 127; 649 NW2d 30 (2002) ("[T]he touchstone of *any* claim of self-defense . . . is *necessity.*"); *People v Ogilvie*, 341 Mich App 28, 40; 989 NW2d 250 (2022) ("[U]nderpinning self-defense doctrine is the longstanding

-6-

principle that a person should use no more force than reasonably appears necessary to repel a threat."); *People v Guajardo*, 300 Mich App 26, 35; 832 NW2d 409 (2013) ("In general, a defendant does not act in justifiable self-defense when he or she uses excessive force or when the defendant is the initial aggressor." ).

Here, the jury could have reasonably concluded from the record evidence that Keats was not using the baseball bat or any other deadly weapon against McMath and that defendant's actions of stabbing the victims with a knife were not reasonably necessary to protect McMath such that defendant's acts constituted excessive force that exceeded the scope of permissible acts defendant could have reasonably taken in defense of McMath. *Leffew*, 508 Mich at 638; LaFave, § 10.5(b); *Riddle*, 467 Mich at 127; *Ogilvie*, 341 Mich App at 40; *Guajardo*, 300 Mich App at 35. Defendant essentially asks this Court on appeal substitute itself for the jury and engage in a revaluation of the relative strength and weight of the evidence. However, that is contrary to the proper role of appellate review with respect to a challenge to the sufficiency of the evidence. *Bailey*, 310 Mich App at 713.

> Juries, not appellate courts, see and hear witnesses and are in a much better position to decide the weight and credibility to be given to their testimony. Where sufficient evidence exists, which may be believed by the jury, to sustain a verdict of guilty beyond a reasonable doubt, the decision of the jury should not be disturbed by an appellate court. [*Id*. at 714 (quotation marks and citation omitted).]

Viewing the evidence in a light most favorable to the prosecution as we must, *Smith-Anthony*, 494 Mich at 676, defendant has not demonstrated on appeal that the jury's verdict was not supported by sufficient evidence. Defendant's convictions are therefore affirmed.[4]

## IV. SENTENCING

Defendant additionally challenges the trial court's scoring of two offense variables (OVs) in determining his recommended minimum sentence guidelines range.

> Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence. Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of

---

[4] We note that defendant's appellate argument does not involve the Self-Defense Act (SDA), MCL 780.971 *et seq*. "The SDA codified and expanded the circumstances in which a person may use deadly force in self-defense or in defense of another person without having the duty to retreat." *Leffew*, 508 Mich at 641 (quotation marks and citation omitted). "But aside from limiting one's duty to retreat, the statute did not modify or abrogate the common-law defenses of self-defense or defense of others." *Id*. Defendant has not raised an argument on appeal involving the statutory duty to retreat and instead relies on the common-law defense-of-others doctrine. We further note that defendant does not otherwise challenge the elements of his AWIGBH convictions; indeed, an "affirmative defense admits the crime but seeks to excuse or justify its commission," and "[i]t does not negate specific elements of the crime." *Dupree*, 486 Mich at 704 n 11.

statutory interpretation, which an appellate court reviews de novo. [*People v Rodriguez*, 327 Mich App 573, 576; 935 NW2d 51 (2019) (quotation marks and citation omitted).]

## A. OV 3

Defendant argues that the trial court erroneously assessed 25 points for OV 3 for causing a life threatening or permanent incapacitating injury to the victim because "[t]his level of injury was never proven at trial, and it was improper for the lower court to apply it."

OV 3 is contained in MCL 777.33 and is scored based on a "physical injury to a victim." MCL 777.33(1). Under the statute, 25 points are assessed if "[l]ife threatening or permanent incapacitating injury occurred to a victim." MCL 777.33(1)(c). Ten points are assessed if "[b]odily injury requiring medical treatment occurred to a victim." MCL 777.33(1)(d). "In scoring OV 3, the focus is not on the defendant's actions; 'rather, OV 3 assesses whether a *victim's injuries* were life-threatening.'" *People v Chaney*, 327 Mich App 586, 588; 935 NW2d 66 (2019), quoting *People v Rosa*, 322 Mich App 726, 746; 913 NW2d 392 (2018).

In *Chaney*, after observing that the term "life-threating" is not statutorily defined for purposes of MCL 777.33, this Court consulted a dictionary to define the term "life-threatening" to mean "capable of causing death: potentially fatal." *Chaney*, 327 Mich App at 589 (quotation marks and citations omitted). The child-abuse victim in that case, who was three years old, suffered severe burns to the lower legs and feet from hot bath water while in the defendant's care. *Id*. at 588. The victim was hospitalized for "several weeks" to treat the burns. *Id*. This Court held that the trial court clearly erred by finding that the victim suffered a "life-threatening" injury for purposes of MCL 777.33 and assessing 25 points. *Chaney*, 327 Mich App at 590. We reasoned as follows:

> After reviewing the medical records, we conclude that the trial court clearly erred by finding that DM suffered a life-threatening injury. The medical records do not indicate that DM's injuries were potentially fatal. Nor did Dr. Donoghue testify to that effect. While DM suffered a serious injury requiring a lengthy hospitalization, no heroic measures were needed, and there is no suggestion in the records that DM's life was ever in danger. Her burn wounds required multiple procedures, but the medical records show that there were no complications and that she was in stable condition throughout her hospital stay. If the fact that the DM's injuries required significant and ongoing medical treatment by itself established a life-threatening injury, MCL 777.33(1)(d) (10 points for bodily injury requiring medical treatment) would be rendered nugatory. Instead, we must give effect to the ordinary meaning of "life-threatening" by requiring some evidence indicating that the injuries were, in normal course, potentially fatal. In the absence of evidence suggesting that DM's life was placed at risk or more general evidence establishing that the injury suffered was by nature life-threatening, the trial court's finding was clearly erroneous, i.e., not supported by a preponderance of the evidence. [*Id*. at 590-591 (citation omitted).]

-8-

Here, there was evidence at trial that defendant stabbed Keats three times and that Keats incurred stab wounds to his head, chest, and back. There was further evidence that Keats was bleeding profusely and thought he was going to die. Keats was treated at the scene to prevent against the possibility of his lung collapsing, he was taken to the hospital by ambulance, and his treatment included exploratory surgery of his chest cavity to ensure that there were no additional life-threatening wounds to his internal organs. The stab wounds missed his heart and lung by half an inch and his intestines by less than two inches. According to the testimony of police officer Alana Jannette, Keats was reported to be in "stable but critical condition" at the hospital. Additionally, the PSIR indicates that Keats "was listed in stable critical condition and was taken in for emergency surgery." Keats was hospitalized overnight.

Furthermore, Keats's victim impact statement in the PSIR provides in relevant part:

> Mr. Keats explained he was stabbed three times. Once in the head, once in the chest, and once in the side of his back. He received 15 staples on the top of his head and had stitches inside and outside of his rib cage and back. He had emergency exploratory surgery to assess the extent of the damage to his rib cage area. Mr. Keats was in the hospital for 24 hours. He explained the hospital wanted him to remain there for a week, but he left because he does not have health insurance. Once he arrived home, he was on bed rest for about a month before he had to return to work. He told this writer he was in pain for a long time and sometimes still has pain. However, he has now physically recovered except for the permanent scars.

"When calculating the sentencing guidelines, a court may consider all record evidence, including the contents of a PSIR, plea admissions, and testimony presented at a preliminary examination." *People v McChester*, 310 Mich App 354, 358; 873 NW2d 646 (2015). Under the circumstances present in the instant case, we conclude that the trial court did not clearly err by finding that Keats suffered a life-threatening injury for purposes of OV 3. See *id*. ("Clear error is present when the reviewing court is left with a definite and firm conviction that an error occurred.") (quotation marks and citation omitted). We affirm the trial court's assessment of 25 points for OV 3.

## B. OV 4

Finally, defendant argues that the trial court erred by assessing 10 points for OV 4 based on the occurrence of a psychological injury to a victim requiring treatment.

Under MCL 777.34(1)(a), 10 points are assessed if "[s]erious psychological injury requiring professional treatment occurred to a victim." MCL 777.34(2) further provides as follows: "Score 10 points if the serious psychological injury may require professional treatment. In making this determination, the fact that treatment has not been sought is not conclusive." In *People v White*, 501 Mich 160, 162; 905 NW2d 228 (2017), our Supreme Court held:

> We conclude that (a) points for OV 4 may not be assessed solely on the basis of a trial court's conclusion that a "serious psychological injury" would normally occur

as a result of the crime perpetrated against the victim and (b) evidence of fear while a crime is being committed, by itself, is insufficient to assess points for OV 4.

Here, Keats's victim impact statement in the PSIR states in relevant part as follows:

> Regarding his mental health, Mr. Keats explained he had and still has increased anxiety due to this offense. He explained he is on edge in his home and is easily startled if he hears a noise. He told this writer he feels he has Post Traumatic Stress Disorder, but he has not sought professional treatment.

The trial court explained in assessing 10 points for OV 4 that it relied on Keats's impact statement but recognized that Keats's "self diagnos[is]" of Post Traumatic Stress Disorder was not an official diagnosis. The trial court instead gave weight to Keats's combined statements that he was on edge in his home, easily startled by noises, and had increased anxiety since the offense. On appeal, defendant argues that the trial court should have assessed 0 points because Keats willingly participated in the fight and never sought psychological treatment. Defendant does not cite any authority for the first argument and has therefore abandoned it. *Kelly*, 231 Mich App at 640-641. The second argument is contrary to the plain language of the statute; defendant cannot prevail merely by relying on the fact that Keats has not sought professional treatment at this time because "the fact that treatment has not been sought is not conclusive." MCL 777.34(2).

Affirmed.

/s/ Thomas C. Cameron
/s/ Stephen L. Borrello
/s/ Colleen A. O'Brien