# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DELON MARTELL MILLER,

        Defendant-Appellant.

UNPUBLISHED
April 21, 2015

No. 319694
Ingham Circuit Court
LC No. 13-000228-FC

Before: OWENS, P.J., and JANSEN and MURRAY, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions of one count of first-degree premeditated murder, MCL 750.316(1)(a), four counts of assault with intent to commit murder, MCL 750.83, and one count of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant to life imprisonment for the first-degree murder conviction, concurrent terms of 240 to 480 months for the assault with intent to murder convictions, and a consecutive term of 2 years for the felony-firearm conviction. We affirm.

## I. BACKGROUND

This case stems from an altercation at the "Save On Market" convenience store on New Year's Day, during which several men were shot, including Nicholas Jones who was mortally wounded. Three groups of men were involved, each of which entered the store around 2:00 a.m. The first group to arrive intended to buy liquor after leaving a house party. Soon after the second group arrived, Keith Houston, a member of the second group, had a discussion with Delvanta Mitchell, a member of the first group. Keith Houston testified that while holding a gun, he told Mitchell that he did not like one of Mitchell's acquaintances and that he was going to shoot the acquaintance when and where he found him. Mitchell denied that Keith Houston showed him a gun or threatened to kill his friend. Group three, which included defendant and codefendant Noe Arcaute, entered the store last. Charles Mattox, a member of group one, testified that he and Arcaute exchanged dirty looks after which Arcaute said that he "had a Magic Johnson for anybody," which Mattox understood to mean that Arcaute was armed with a gun and clip holding 32 bullets.

Soon thereafter, a fight broke out. One of the combatants, Alim Muhammad, testified that while he was being hit by multiple people, he pulled out a knife and started "stabbing air"

-1-

with his eyes "basically closed." Keith Houston testified that he was standing near the door when the fight began, with his back to the fight. He said he turned around when he heard a commotion and took a couple steps closer to watch. As he was approaching the fight, Keith Houston testified, he saw defendant "come back shooting" after "[a] couple, like seconds." Keith Houston said he was shot while trying to run away.

Jerome Houston testified that he was standing by the cash register when the fight broke out, and "then all of a sudden a gun came up" and he heard shots fired. Jerome Houston said defendant shot first, aiming at Tyrazes Brown and Shawon Calvin, and fired two shots before Brown pulled out a gun and returned fire. Jerome Houston estimated that defendant and Brown each fired a total of five or six rounds while inside the store. Jerome Houston said defendant approached him, pointed his weapon at him and pulled the trigger, but that defendant's gun "didn't go off anymore." Jerome Houston said defendant then bent over near the victim, who was shot and lying on the ground, and said, "they shouldn't have jumped on me" and "sorry." Jerome Houston said he then went back to his car while defendant and another man exchanged fire by their respective vehicles. Medical evidence established that the victim was shot on the left side of his chest, and that the bullet entered his body "closer to his back than to his front." Medical evidence also established that Brown sustained gunshot wounds to the chest and arm, Terreon Smith was wounded in his leg and buttocks, and Keith Houston had a gunshot wound to his leg.

Several residents of a house located next to the store testified to what happened outside of the store. One witness said she saw a group of people running from the store after hearing two gunshots. The witness testified that two men then exited the store, with the bigger man exchanging gunfire with someone else while he and his companion were standing behind a van. Three witnesses testified that a third man approached the smaller of the two by the van and shot him in the back. The smaller man was Arcaute.

Portions of the video surveillance footage from the store were played during trial, with Lansing Police Department Detective Mark Lewandowsky providing narration. The officer testified that he spent 30 to 40 hours reviewing the videos and could identify the people shown in the videos based on his investigation of the case and personal interactions with many of them. In one segment taken from inside the store, Lewandowsky testified, Arcaute can be seen with his hand on a long, metallic object tucked horizontally in his waistband, which appeared to Lewandowsky as the handle of a pistol and a magazine. Lewandowsky also testified that the video showed defendant separating himself from the "fighting mass of people" and then he and Arcaute go down to the end of an aisle, where Arcaute handed something to defendant. According to Lewandowsky, the footage shows defendant going back to the front of the store and raising his arms. Seconds later, the officer explained, the victim is seen falling to the floor. Lewandowsky further testified that defendant is seen a few seconds later holding a gun with an "extra long magazine protruding from the bottom of the gun" and Brown attempting to shoot defendant. According to Lewandowsky, Arcaute is observed hiding by a cooler while these shots were fired. Lewandowsky said exterior video footage showed five people with guns, including defendant.

## II. ANALYSIS

### A. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that there was insufficient evidence to sustain his convictions for first-degree murder and assault with intent to murder. This Court reviews sufficiency of the evidence issues de novo. *People v Ericksen*, 288 Mich App 192, 195-196; 793 NW2d 120 (2010).

"To determine whether the prosecutor has presented sufficient evidence to sustain a conviction, [appellate courts] review the evidence in the light most favorable to the prosecutor and determine whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Smith-Anthony*, 494 Mich 669, 676; 837 NW2d 415 (2013) (citation and internal quotation marks omitted). "The standard of review is deferential: a reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Nowak*, 462 Mich 392, 400; 614 NW2d 78 (2000). Further, "[c]ircumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime," *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999) (citation and internal quotation marks omitted), and "there is absolutely nothing wrong with conviction[s] built on inferences derived from circumstantial evidence," *People v LaFountain*, 495 Mich 968, 969; 844 NW2d 5 (2014) (citation and internal quotation marks omitted).

"To establish first-degree premeditated murder, the prosecution must prove that the defendant intentionally killed the victim and the act of killing was deliberate and premeditated." *People v Haywood*, 209 Mich App 217, 229; 530 NW2d 497 (1995). "Premeditation and deliberation require sufficient time to allow the defendant to take a second look." *People v Schollaert*, 194 Mich App 158, 170; 486 NW2d 312 (1992). "The elements of premeditation and deliberation may be inferred from all the facts and circumstances surrounding the incident, including the parties' prior relationship, the actions of the accused both before and after the crime, and the circumstances of the killing itself[.]" *People v Haywood*, 209 Mich App 217, 229; 530 NW2d 497 (1995) (citations omitted). "The elements of assault with intent to commit murder are: (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder." *People v Brown*, 267 Mich App 141, 147; 703 NW2d 230 (2005) (internal quotation marks and citations omitted).

Defendant claims that there was insufficient evidence to prove that he acted with deliberation and premeditation. This argument is without merit. Video surveillance footage showed that defendant separated himself from the brawl and retreated to safety at the end of an aisle, along with Arcaute, before returning to the brawl and opening fire with a gun he had been given by Arcaute. Defendant could have stayed at the end of the aisle once there, as there was no evidence that any shots were being fired at that time or that the brawl was encroaching upon his location. He also could have declined to take Arcaute's gun. And even after he returned to the brawl, there is no indication he was in imminent danger.

The same evidence also undermines defendant's assertion that there was insufficient evidence that he acted with an intent to kill. Instead of staying in his secure location away from the brawl, defendant obtained Arcaute's gun, returned to the brawl, and shot Tyrazes Brown,

-3-

Keith Houston, Shawon Calvin, and Terreon Smith. This evidence does not show a person acting in the heat of the moment. Rather, a reasonable jury could have concluded that defendant was motived to kill in retaliation for being punched, that he was the aggressor in this situation, and that by using an instrument of deadly force, he intended a deadly result. Moreover, defendant fails to provide authority showing that being punched during a brawl is sufficient provocation to designate the killing as manslaughter, especially where the person who was punched had the time and awareness to retreat to a place of safety before committing the killing. That defendant separated himself from the brawl after being punched and retreated to a place of safety demonstrated his clarity of thought, rather than a loss of control indicative of voluntary manslaughter. See *People v Pouncey*, 437 Mich 382, 389; 471 NW2d 346 (1991) ("Not every hot-tempered individual who flies into a rage at the slightest insult can claim manslaughter.").

Accordingly, defendant has failed to show that there was insufficient evidence to support his convictions for first-degree murder and assault with intent to commit murder.

## B. VIDEO IDENTIFICATION

Next, defendant argues that Lewandowsky's identification of the people depicted in the store's video surveillance footage was improper and warrants reversal. Because defendant did not preserve this issue below, we review it for plain error affecting substantial rights. *Carines*, 460 Mich at 763-764. An error is plain when it is clear or obvious. *Id.* at 763. An error affects substantial rights when it "could have been decisive of the outcome" of the case. *People v Grant*, 445 Mich 535, 547; 520 NW2d 123 (1994). Further, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Carines*, 460 Mich at 763-764 (internal quotation marks and citation omitted). Under the circumstances of this case, defendant has failed to show that the admission of Lewandowsky's testimony was plainly erroneous.

MRE 701, permitting the admission of lay opinion testimony, provides as follows:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

In *People v Fomby*, 300 Mich App 46, 49-52; 831 NW2d 887 (2013), this Court held that a witness's narrative description of a video and identification of actors in still images from the video constituted admissible lay opinion testimony under MRE 701. The Court concluded that the opinions were rationally based on the witness's perception, even though the witness did not observe firsthand the events depicted in the video, because the witness watched the video, produced short clips of individuals in the video, and isolated certain frames to create still images. *Id.* at 50-51. The Court also concluded that the opinion testimony was helpful to a clear understanding of the video and a fact at issue because the video was long and the witness testified that he reached his conclusion after reviewing the full video. *Id.* at 52.

Similarly, Lewandowsky's opinion testimony about the actors in the store's video surveillance footage was proper, even though he did not witness the events depicted in the videos, because he testified that he reviewed the videos for some 30 to 40 hours and made his identifications after investigating the case and personally interviewing many of the actors involved. Most importantly, as it relates to defendant, Lewandowsky interviewed him twice shortly after the shootings, meaning he was personally aware of defendant's appearance on the night of the shootings. Also, as in *Fomby*, Lewandowsky's opinion testimony was helpful to the jury's understanding of the events because it put together the pieces of video footage collected from multiple cameras recording in multiple directions.

Nor did the testimony invade the province of the jury. See *id*. at 52-53. Lewandowsky did not make an improper expression of opinion as to the defendant's guilt, see *People v Bradgon*, 142 Mich App 197, 199; 369 NW2d 208 (1985), and explained further that the witness was in the best position to identify those depicted in still images from the video because he created the still images, see *Fomby*, 300 Mich App at 53. In sum, defendant has failed to show that the trial court's admission of Lewandowsky's lay opinion testimony was erroneous, let alone plainly erroneous.

Moreover, defendant has failed to show that Lewandowsky's testimony was decisive of the outcome of the case or seriously affected the fairness and integrity of the proceedings, or that he was convicted despite his actual innocence. His testimony was not decisive because the jury was nevertheless able to compare defendant's appearance in court with the video footage, and because Keith Houston testified that he saw defendant shooting in the store. Indeed, defendant does not deny that he shot the victim.

## C. PROSECUTORIAL MISCONDUCT

Next, defendant argues that the prosecutor committed misconduct by vouching for Keith and Jerome Houston's credibility and implying that he had special knowledge concerning the truthfulness of their trial testimony. Defendant concedes this issue is unpreserved. "Unpreserved claims of prosecutorial misconduct . . . are reviewed for plain error" affecting substantial rights. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004). "Further, [this Court] cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect." *People v Callon*, 256 Mich App 312, 329-330; 662 NW2d 501 (2003).

"Included in the list of improper prosecutorial commentary or questioning is the maxim that the prosecutor cannot vouch for the credibility of his witnesses to the effect that he has some special knowledge concerning a witness' truthfulness." *People v Bahoda* 448 Mich 261, 276; 531 NW2d 659, (1995). Defendant claims that the prosecutor violated this maxim by acknowledging Keith and Jerome Houston's plea agreements in federal-court proceedings, and stating that he would inform the U.S. Attorneys prosecuting their federal charges as to whether he believed they testified truthfully. However, a simple "reference to a plea agreement containing a promise of truthfulness is in *itself* [not] grounds for reversal." *Id*. (citation and quotation marks omitted; emphasis in original). "Generally, by calling a witness who testifies pursuant to an agreement requiring him to testify truthfully, the Government does not insinuate possession of information not heard by the jury and the prosecutor cannot be taken as having

expressed his personal opinion on a witness' veracity." *Id.* (citation, quotation marks, and punctuation omitted). Further, the prosecutor did not indicate that his belief concerning the truthfulness of the cited testimony would be based on any special knowledge not heard by the jury. Accordingly, defendant has failed to show that these statements were improper.

Next, defendant contends that the prosecutor committed misconduct by denigrating his counsel during closing arguments and claiming that his counsel was intentionally misleading the jury. "Prosecutors are typically afforded great latitude regarding their arguments and conduct at trial," and "[t]hey are generally free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *People v Unger*, 278 Mich App 210, 236; 749 NW2d 272 (2008). "However, [a] prosecutor may not suggest that defense counsel is intentionally attempting to mislead the jury." *Id.* (citation and internal quotation marks omitted; alteration by *Unger* Court).

Defendant takes issue with the following argument by the prosecutor: "Let me address [defendant's counsel's] position first, and respectfully, let me say this to the factual recitation that [defendant's counsel's] gave you. Nonsense, bunk, not supported by the evidence, preposterous, not reasonable doubt, possible doubt or in the realm of possibility, and unsupported by the evidence." None of these statements suggested that defendant's counsel was intentionally attempting to mislead the jury. The prosecutor merely argued—albeit with vigor—that defense counsel's recitation of the facts was erroneous and not supported by the evidence, and the prosecutor went on to explain why the jury should agree with his argument. Accordingly, defendant has failed to show any prosecutorial misconduct.

Moreover, defendant fails to explain why a curative instruction could not have alleviated any prejudicial effect of the alleged misconduct. *Callon*, 256 Mich App at 329-330. See also *Unger*, 278 Mich App at 23 (2008) (noting that curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements, and jurors are presumed to follow their instructions).

## D. NEIGHBORHOOD REPUTATION

Finally, defendant argues that the trial court abused its discretion in precluding a police officer from testifying regarding the reputation for violence of the neighborhood where the shooting occurred. "The decision whether to admit evidence is within the discretion of the trial court and will not be disturbed on appeal absent a clear abuse of discretion." *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *Fomby*, 300 Mich App at 48 (internal quotation marks and citation omitted). "[P]reliminary questions of law, e.g., whether a rule of evidence or statute precludes admissibility of evidence," are reviewed de novo. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). Further, "a preserved, nonconstitutional error is not a ground for reversal unless after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative." *Id.* at 496 (citation and internal quotation marks omitted).

During trial, a police officer testified that he had patrolled the area of the store about eight months before the shooting. When defense counsel asked the officer if there had been any

other instances of gunshots in the area during that time, plaintiff objected. Defense counsel explained that the answer was relevant to the state of mind of the people in the store. The trial court disagreed, ruling that such testimony was not relevant. On appeal, defendant claims that the trial court's ruling was erroneous and denied him the opportunity to argue that he acted in self-defense.

Here, defendant fails to show how a police officer's knowledge of prior gunshots in the area of the store during the eight months before the shooting would have made it more likely that defendant fired his weapon in self-defense, as required under MRE 401 and 402. Self-defense is predicated on a reasonable fear of imminent harm, see *People v Riddle*, 467 Mich 116, 119; 649 NW2d 30 (2002), and any testimony about events occurring in the months preceding the shooting had no bearing on the imminence of harm facing defendant. Moreover, its exclusion did not deny him the opportunity to argue that he acted in self-defense. In fact, there was direct evidence that other men in the store possessed firearms prior to the shooting and that a brawl was taking place.

Affirmed.

/s/ Donald S. Owens
/s/ Kathleen Jansen
/s/ Christopher M. Murray