# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

VALENTINO LAHRON LEE STEWART, JR.,

        Defendant-Appellant.

UNPUBLISHED
February 18, 2016

No. 323969
Ingham Circuit Court
LC No. 14-000463-FC

Before: HOEKSTRA, P.J., and METER and M. J. KELLY, JJ.

PER CURIAM.

Defendant was convicted, following a jury trial, of second-degree murder, MCL 750.317; assault with intent to commit murder, MCL 750.83; carrying a concealed weapon (CCW), MCL 750.227; and possession of a firearm during the commission of a felony (felony firearm), MCL 750.227b. He was sentenced to concurrent terms of 300 to 600 months in prison for second-degree murder, 200 to 400 months in prison for assault with intent to commit murder, and 24 to 60 months for CCW, to be served consecutively to a two-year prison term for felony firearm. For the reasons explained in this opinion, we affirm defendant's convictions but remand for a *Crosby*[1] hearing.

## I. FACTS

According to the evidence introduced at trial, on June 26, 2013, defendant participated in a shooting on North Pine Street in Lansing that resulted in the death of Anthony Kye. Kye's autopsy report showed that he had been shot three times, and that his wounds were consistent with those caused by a high-powered rifle. Although Kye lost his life in the shooting, it appears that he was not the intended victim. Rather, the shooters intended to kill someone known as "Fat Cat," who assaulted defendant several days prior to the shooting.

One of the principal witnesses at defendant's trial was Mark Williams, who lived with defendant and defendant's family, including defendant's brother, Jamon Hampton. Williams

---

[1] *United States v Crosby*, 397 F3d 103, 117 (CA 2 2005).

testified that on June 26, 2013, he agreed to defendant's request to drive defendant and Hampton to the store. Williams was new to the area, so Hampton provided directions; but it soon became clear that Hampton was not directing him to a store. During the drive, Williams heard Hampton ask defendant if "they were going to be doing this by their self [sic] or were we . . . meeting somebody over there." Hampton also asked defendant whether he had a "mag," and defendant responded that he had only three bullets. According to Williams, defendant owned a 9-millimeter pistol which he was carrying that night.

Williams testified that Hampton eventually directed him to a corner near the intersection of Lapeer and Pine streets. Williams offered Hampton the use of a firearm, which Williams had stored in the trunk of his car. In response, Hampton asked to use his AR-15 assault rifle, so Williams loaded the weapon and gave it to Hampton. Hampton and defendant then ran off into the night.

Williams and other witnesses testified that they heard repeated gunfire, and Williams testified that he recognized it as the sound of his assault rifle. Defendant and Hampton returned to Williams's car a few moments later, and he drove back to the apartment. Defendant called someone while they were driving, and told the person to avoid the north side of town because it was "hot," and to meet them at the apartment. When they returned to the apartment building, Jarvis Askew and Charles Mattox, who were friends of defendant and Hampton, were waiting in the parking lot. Mattox testified that defendant told them that he had seen Fat Cat and shot twice in the air. According to Williams, while they were discussing the shooting, they learned through phone calls that the "wrong person" had been killed.

A jury convicted defendant of second-degree murder, assault with intent to commit murder, CCW, and felony firearm. The trial court sentenced defendant as noted above. Defendant now appeals as of right.

## II. PROSECUTORIAL MISCONDUCT

On appeal, defendant first argues that the prosecutor committed misconduct during closing arguments when the prosecutor stated that defendant was a "member of a gang" and that the shooting had been undertaken in retaliation for the beating suffered by defendant. Defendant maintains that references to defendant's gang membership were unsupported by the evidence and that such remarks impermissibly urged the jury to convict defendant based on gang affiliation. Defendant asserts that the mention of gangs is inherently prejudicial and that, therefore, the prosecutor's remarks require reversal of his conviction.

Defense counsel objected to the prosecutor's remarks at trial, thereby preserving this issue for appellate review. *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). We review de novo preserved claims of prosecutorial misconduct to determine whether the defendant was denied a fair and impartial trial. *People v Akins*, 259 Mich App 545, 562; 675 NW2d 863 (2003). "Issues of prosecutorial misconduct are decided case by case, and this Court must examine the entire record and evaluate a prosecutor's remarks in context." *People v Dobek*, 274 Mich App 58, 64; 732 NW2d 546 (2007). The prosecutor's comments are evaluated in light of "the relationship the comments bear to the evidence admitted at trial." *Id.* "Prosecutors are typically afforded great latitude regarding their arguments and conduct at trial."

*People v Unger*, 278 Mich App 210, 236; 749 NW2d 272 (2008). They are permitted to argue the evidence and all reasonable inferences arising from the evidence as they relate to the prosecutor's theory of the case. *People v Lane*, 308 Mich App 38, 63; 862 NW2d 446 (2014). However, a prosecutor may not make a factual statement to the jury that is not supported by the evidence. *Dobek*, 274 Mich App at 66.

In this case, during closing argument, the prosecutor discussed the motive for defendant's involvement with the shooting and he stated that the case was "just about a retaliation, a gang retaliation shooting" that defendant had taken part in "because he is a member of a gang who was beaten." Defense counsel objected, and argued that no evidence had been presented to support the prosecutor's characterization of defendant as a gang member. The trial court instructed the prosecutor to "move on." The prosecutor continued by characterizing the case as a story of "[r]etaliation between two warring groups," and stated that Mattox had referred to his friends, including defendant, Askew, Hampton, and Williams, as a "group" or "crew."

Contrary to defendant's arguments on appeal, the discussion of the motivation for the crime did not deprive defendant a fair trial and these statements by the prosecutor were reasonable inferences from the evidence presented at trial. For example, Mattox testified that defendant had been in a fight with "Fat Cat and his crew," a group that called themselves "STB" or "Shaking the Bag," which was a drug reference of some kind. In comparison, Mattox testified that his "group" or "crew" consisted of defendant, Askew, Hampton, and Williams. In response to the prosecutor's questioning, Mattox agreed that his "group" as well as Fat Cat's "crew" could be characterized as "groups of people who are in gangs or loose association with each other." Based on Mattox's testimony, the prosecutor's reference to defendant as a gang member was a reasonable inference. Similarly, the prosecutor's statement that the case was about gang "retaliation" was a reasonable inference based on Williams's testimony that defendant wanted revenge for his assault as well as testimony from Mattox that he and Askew were planning to "squash" Fat Cat and "[t]o settle the situation" on the night of the shooting. In sum, the prosecutor's comments during closing argument were based on the evidence presented at trial. Consequently, these remarks on the prosecutor's theory of the case relating to the motive for the shooting were not improper and defendant is not entitled to a new trial on this basis.

## III. INSUFFICIENT EVIDENCE

Defendant argues that the prosecutor presented insufficient evidence to establish the elements of second-degree murder beyond a reasonable doubt because questions as to the identity of the shooters were not satisfactorily resolved and because Williams and Mattox were not credible witnesses.

We review de novo a challenge to the sufficiency of the evidence. *People v Harverson*, 291 Mich App 171, 177; 804 NW2d 757 (2010). "We examine the evidence in a light most favorable to the prosecution, resolving all evidentiary conflicts in its favor, and determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond reasonable doubt." *People v Ericksen*, 288 Mich App 192, 196; 793 NW2d 120 (2010). The elements of a crime may be established by circumstantial evidence and reasonable inferences from the evidence, and this Court will "not interfere with the jury's assessment of the

weight and credibility of witnesses or the evidence." *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013).

In order to convict a defendant of second-degree murder, the prosecution must show that there was "(1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Goecke*, 457 Mich 442, 463-464; 579 NW2d 868 (1998). In addition, "it is well settled that identity is an element of every offense." *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008).

In this case, Williams testified to driving defendant and Hampton to the area where the shooting occurred. While they were driving, defendant pointed out the intended victim, stating "It's him. It's him." After Williams parked the car, defendant and Hampton ran into the night armed with guns, including the AR-15 carried by Hampton. The shooting followed shortly thereafter, and an autopsy later showed that Kye died as a result of gunshot wounds. In addition, defendant had a 9mm handgun in his possession that evening, 9mm shell casings were found at the scene, defendant told Mattox that he saw "Fat Cat" that evening and that he shot the 9mm handgun into the air, and defendant warned Askew via cell phone to avoid the area because they had "just shot it up." Defendant had a motive for the crime, insofar as he wanted revenge for the assault perpetrated by "Fat Cat;" and, when informed that the wrong victim had been killed, defendant stated that Kye "shouldn't have been there." While defendant challenges the credibility of the testimony presented and argues that other inferences could be drawn, it was the jury's responsibility to determine the witnesses' credibility and to decide the facts from the evidence presented. See *Dunigan*, 299 Mich App at 582. Viewing the evidence in a light most favorable to the prosecutor, there was sufficient evidence to establish defendant's identity as one of the shooters.

In contrast, defendant argues that the elements of the offense were not proven beyond a reasonable doubt because one of the prosecution's eyewitnesses described the suspect as a tall, slender man who wore dreadlocks while, in comparison, defendant was a large and not particularly tall person who did not wear dreadlocks in his short hair. Because the witness's description does not match defendant, defendant maintains there was insufficient evidence to establish his identity. Again, it was for the jury to weigh this evidence, and the significance of any inconsistency between this description and defendant's physical appearance was for the jury to resolve. See *id.* And, it is axiomatic that "a jury is free to believe or disbelieve, in whole or in part, any of the evidence presented." *People v Perry*, 460 Mich 55, 63; 594 NW2d 477 (1999). Moreover, we note that, contrary to defendant's argument, this was not the only eyewitness description of a suspect. Defendant does not address the testimony of another eyewitness, who observed that the suspect had short hair and was wearing brightly colored tennis shoes, which arguably corroborated Mattox's testimony that defendant was wearing red tennis shoes on the night of the shooting. Overall, viewing the evidence in a light most favorable to the prosecution, the evidence was sufficient to support defendant's conviction for second-degree murder.

## IV. JURY INSTRUCTIONS

In a Standard 4 brief, defendant argues that an instruction for voluntary manslaughter should have been given at trial. Defendant did not request an instruction for voluntary

manslaughter before the trial court. However, defendant argues that the trial court erred by failing to instruct the jury on this offense sua sponte.

Because defendant failed to request the instruction at issue, his claim is unpreserved and our review is for plain error affecting his substantial rights. *People v Aldrich*, 246 Mich App 101, 124; 631 NW2d 67 (2001); *People v Sabin (On Second Remand)*, 242 Mich App 656, 657; 620 NW2d 19 (2000). "A criminal defendant is entitled to have a properly instructed jury consider the evidence against him." *People v Riddle*, 467 Mich 116, 124; 649 NW2d 30 (2002). Voluntary manslaughter is a necessarily lesser-included offense of murder. *People v Mendoza*, 468 Mich 527, 540-541; 664 NW2d 685 (2003). When a defendant is charged with murder, he is entitled to a jury instruction for voluntary manslaughter "if supported by a rational view of the evidence." *Id*. at 541.

In this case, a rational view of the evidence did not support the giving of a voluntary manslaughter instruction, and thus defendant has not shown plain error. In particular, in order to convict a defendant of voluntary manslaughter, the prosecutor "must show that the defendant killed in the heat of passion, the passion was caused by adequate provocation, and there was not a lapse of time during which a reasonable person could control his passions." *People v Reese*, 491 Mich 127, 143; 815 NW2d 85 (2012) (internal quotation marks and citation omitted). According to defendant's argument on appeal, his actions during the night of the shooting were provoked by Fat Cat's assault on him. However, although the record is not clear as to the exact amount of time that elapsed between the assault on defendant and the shooting (nor does defendant clarify this point on appeal), Williams indicated at trial that at least several days had passed between the two events. Given this significant lapse of time between the purported provocation and the shooting, there was ample time for defendant to control his passions and a rational view of the evidence did not support the giving of a voluntary manslaughter instruction. See *id*.; *Mendoza*, 468 Mich at 541. Thus, defendant has not shown plain error in the trial court's failure to instruct the jury on voluntary manslaughter.[2]

## V.  SCORING OF OFFENSE VARIABLES

In his Standard 4 brief, defendant also asserts that he is entitled to resentencing due to errors in the scoring of Offense Variables 2, 6, 9, 12, and 14.

"Determining whether a trial court properly scored sentencing variables is a two-step process." *People v Marshall*, 495 Mich 983; 843 NW2d 925 (2014). First, we review the trial court's factual determinations for clear error, which "must be supported by a preponderance of

---

[2] In the course of his jury instruction argument, defendant argues that, because there was evidence that he shot into the air, the jury could not conclude that defendant shot Kye or that he intended to do so. To the extent defendant attempts to challenge the sufficiency of the evidence supporting his convictions, this argument is improperly presented, MCR 7.212(C)(5), and it is clearly without merit. Even if defendant did not fire the fatal shots, the jury was also instructed on an aiding and abetting theory. Under such a theory, there was ample evidence supporting defendant's convictions. See generally *People v Robinson*, 475 Mich 1; 715 NW2d 44 (2006).

the evidence." *People v Hardy,* 494 Mich 430, 438; 835 NW2d 340 (2013). Second, we must decide "[w]hether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id.* See also *People v Steanhouse,* __ Mich App __, __; __ NW2d __ (2015) (Docket No. 318329), slip op at 19.

In this case, as originally scored, defendant's total OV score for second-degree murder was 161 points. At a sentencing hearing on September 3, 2014, with the agreement of the parties, the trial court approved several changes that reduced defendant's total OV score to 115.[3] Specifically, the trial court changed the scoring of OV 2 from 10 to 5 points, reduced the scoring of OV 6 from 50 to 25 points, altered the scoring of OV 9 from 25 to 10 points, and corrected the scoring of OV 12 from 1 to 0 points. We mention these changes because many of the precise changes requested by defendant on appeal were already made by the trial court—namely, those changes to the scoring of OV 2, OV 9, and OV 12. Because the trial court already granted the requested relief, this issue is moot and we need not consider it further. See *People v Pennington,* 240 Mich App 188, 197; 610 NW2d 608 (2000).

With regard to OV 6, defendant argues on appeal that OV 6 should have been scored 10 points, rather than the 25 points assessed by the trial court. MCL 776.36 governs the scoring of OV 6, which "is the offender's intent to kill or injure another individual." Under OV 6, 25 points is appropriate if the offender "had unpremeditated intent to kill, the intent to do great bodily harm, or created a very high risk of death or great bodily harm knowing that death or great bodily harm was the probable result." MCL 777.36(1)(b). In comparison, 10 points is properly scored if the defendant "had intent to injure or the killing was committed in an extreme emotional state caused by an adequate provocation and before a reasonable amount of time elapsed for the offender to calm or there was gross negligence amounting to an unreasonable disregard for life." MCL 777.36(1)(c). The sentencing court is required to score OV 6 "consistent with a jury verdict unless the judge has information that was not presented to the jury." MCL 777.36(2)(a). Consequently, in this case, the trial court properly scored defendant at 25 points, which was consistent with the jury's verdict of second-degree murder.

Next, defendant argues that the trial court should have scored OV 14 at 0 points, rather than 10 points. OV 14 relates to an offender's role in a multiple offender situation, and 10 points is properly scored when the offender "was a leader in a multiple offender situation." MCL 777.44(1)(a). When more than 3 offenders are involved, more than one individual may be considered a "leader." MCL 777.44(2)(b). Defendant argues that he should have been scored zero points because he was not a leader and because several other people were involved in orchestrating and carrying out the shooting. Before the trial court, defense counsel also noted that defendant, at 16 years of age, "was by far the youngest person involved" in the shooting, and argued that the evidence indicated that Askew "may have planned this or directed it," although counsel did not cite evidence in support of this assertion. The court rejected defendant's

---

[3] However, we note that a corrected sentencing information report does not appear in the lower court records provided to us on appeal.

argument and upheld the score based on Williams's testimony that defendant selected the individual to be shot when defendant announced "that's him" while they were driving to the location of the shooting. The trial court reasoned "that this defendant did pick out and identify who was to be shot. That's a leadership role." Given the evidence presented, the court's decision was not clearly erroneous. Moreover, any error in the scoring of OV 14—which would reduce defendant's total OV score to 105—would not alter the recommended sentencing range. See MCL 777.61. Thus, even assuming some error, defendant would not be entitled to resentencing on this basis. See *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006).

## VI. JUDICIAL FACT-FINDING

Lastly, in a supplement brief filed pursuant to MCR 7.212(F), defendant argues that he is entitled to resentencing following the recent Michigan Supreme Court decision in *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015). In *Lockridge,* the Court determined that Michigan's sentencing guidelines violate the Sixth Amendment right to a jury trial insofar as they require a sentencing judge to find facts at sentencing that mandatorily increase the floor of the recommended minimum sentencing range. *Id.* at 373-374. As a remedy to this constitutional defect, following *Lockridge*, the sentencing guidelines are now "advisory only." *Id.* at 391. That is, while the guidelines "remain a highly relevant consideration in a trial court's exercise of sentencing discretion," they are no longer mandatory, and a trial court may depart from the recommended range without articulating substantial and compelling reason for the departure, provided that the resulting sentence is "reasonable." *Id.* at 391-392.

While declaring the guidelines advisory, *Lockridge* made clear that such claims of error are amenable to plain error review. *Id.* at 394-395. To establish plain error, a defendant must make a "threshold showing" on appeal, which would then entitle the defendant to a remand for a *Crosby* hearing. *Id.* at 395. As explained in *Lockridge*:

> [A]ll defendants (1) who can demonstrate that their guidelines minimum sentence range was actually constrained by the violation of the Sixth Amendment and (2) whose sentences were not subject to an upward departure can establish a threshold showing of the potential for plain error sufficient to warrant a remand to the trial court for further inquiry. [*Id.*]

Under the first prong, an unconstitutional constraint on a defendant's Sixth Amendment right may be shown when "facts admitted by a defendant or found by the jury verdict were insufficient to assess the minimum number of OV points necessary for the defendant's score to fall in the cell of the sentencing grid under which he or she was sentenced." *Id.*

In this case, defendant was not subject to an upward departure and it is clear that the trial court's calculation of the sentencing guideline range involved reliance on facts not admitted by defendant or supported by the jury's verdict. In particular, under MCL 777.61, defendant would need a minimum of 100 points to be at OV level III for second-degree murder. As noted, defendant had a total OV score of 115 points. However, this score involved findings that members of the victim's family suffered serious psychological injury (15 points for OV 5), that 2 to 9 victims were placed in danger of physical injury or death (10 points for OV 9), and that defendant was a leader in a multiple offender situation (10 points under OV 14). If these

variables had not been scored in this manner, defendant's OV level would drop from III to II. Thus, because these facts were neither admitted by defendant nor supported by the jury's verdict, it is plain that these judicially-found facts resulted in an increased minimum sentencing range. Cf. *People v Stokes*, __ Mich App, __; __ NW2d__ (2015) (Docket No. 321303), slip op 6-7. Consequently, defendant has made a threshold showing under *Lockridge*, entitling him to a remand for a *Crosby* hearing. See *Lockridge*, 498 Mich 394-395.

"[T]he purpose of a *Crosby* remand is to determine what effect *Lockridge* would have on the defendant's sentence, so that it may be determined whether any prejudice resulted from the error." *Stokes*, slip op at 11. The trial court must decide whether it would have imposed the same sentence absent the unconstitutional constraint on its discretion; and, if not, the court must resentence the defendant. *Lockridge*, 498 Mich at 399. Because defendant faces the possibility of a more severe sentence on resentencing, he must be given the option of promptly notifying the trial judge that resentencing will not be sought. *Stokes*, slip op 11-12. If notification is not received in a timely manner, the trial court shall continue with the *Crosby* remand proceedings as set forth in *Lockridge*, 498 Mich at 395-398.

Affirmed, but remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Joel P. Hoekstra
/s/ Patrick M. Meter
/s/ Michael J. Kelly