# Order

**Michigan Supreme Court**
**Lansing, Michigan**

March 9, 2018

153828

PEOPLE OF THE STATE OF MICHIGAN,
        Plaintiff-Appellee,

v

THEODORE PAUL WAFER,
        Defendant-Appellant.

_____/

Stephen J. Markman,
Chief Justice

Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Kurtis T. Wilder
Elizabeth T. Clement,
Justices

SC: 153828
COA: 324018
Wayne CC: 14-000152-FC

On October 12, 2017, the Court heard oral argument on the application for leave to appeal the April 5, 2016 judgment of the Court of Appeals. On order of the Court, the application is again considered, and it is DENIED, because we are not persuaded that the questions presented should be reviewed by this Court.

MARKMAN, C.J. (*dissenting*).

Renisha McBride, the deceased, was shot and killed by defendant in the middle of the night on defendant's porch. In hindsight, it appears likely that she was seeking some aid after being involved in a nearby car accident a few hours earlier. Defendant, unfortunately, was unaware of these facts. Instead, understanding only that his home was under assault from one or more unknown individuals outside, he chose to meet the apparent threat at his front door.

Despite the tragic nature of this case, defendant was entitled to a fair trial with all the protections guaranteed to him by law. In my judgment, however, defendant was deprived of a critical protection at trial. This deprivation prejudiced the outcome, for which the only remedy is a new trial. Accordingly, I respectfully dissent from this Court's order denying leave to appeal.

## I. FACTS AND PROCEEDINGS

Defendant lived alone in Dearborn Heights, close to the border of Detroit. He was aware that his neighborhood had recently suffered from an increase in crime. For instance, one of his neighbors had to display a handgun for protection against apparent drug users. In addition, defendant's vehicle had been vandalized a few weeks before the shooting at issue. As a result of this increase, defendant converted a hunting shotgun that he owned into a shotgun that was better suited for home defense by installing a pistol grip. His home had three doors—at the front, side, and back of the home. All doors were kept locked, including the screen door protecting the front door.

The deceased crashed her car in Detroit (near Dearborn Heights) at about 1:00 a.m. on November 2, 2013.  Witnesses indicated that the deceased seemed "out of it," and she declined to wait for an ambulance.  Instead, she walked away from the scene.  It is not clear what the deceased did between about 1:30 a.m. and 4:30 a.m., nor is it clear why she appeared at defendant's home.  In any event, at about 4:30 a.m., defendant was awakened by a loud banging.

Defendant testified that the banging started at the side door and then moved to the front door.  Defendant looked out of the front-door peephole and saw a figure leaving the porch.  The banging then resumed at the side door, increasing in intensity.  Defendant said that he feared that the person or persons were trying to enter his home and that the side door was being "attacked."  He then obtained a baseball bat and went into the kitchen.  The banging again resumed at the front door; this time, it sounded like metal hitting the door.  Defendant decided to obtain his shotgun from the bedroom closet.  By that point, the banging had again moved to the side door; defendant believed that it sounded like the person or persons were trying to kick in the door.  When the banging at the side door stopped, defendant went to the front door to investigate, fearing that "they" were attempting to break into his home.  He believed that if the person or persons outside saw him at the front door holding a gun, the person or persons might run away.  By then, according to defendant, the front-door peephole was cracked and unusable from the pounding on the door.

Defendant testified that he unlocked the front door, opened it a few inches, and saw that the screen from the screen door was damaged or out of place.  He then opened the front door completely, at which point someone suddenly rushed toward the door.  Defendant explained that he immediately discharged his shotgun while assertedly fearing for his life, apparently with the screen door still closed, and the deceased was killed at close range.  Experts later opined that she was two to eight feet away from the shotgun when it was discharged, but more likely at the short end of that range.  Defendant said that it was only after he discharged the shotgun that he realized the person was a woman.  He called the police at 4:42 a.m., stating that he had "just shot somebody on my front porch with a shotgun banging on my door."[1]

The trial court provided two self-defense instructions to the jury, CJI2d 7.15 and CJI2d 7.16, each of which is consistent with the Self-Defense Act, MCL 780.971 *et seq.*[2]

---

[1] A medical expert testified that at the time of this incident, the deceased had "very high alcohol levels," "active marijuana in her system," and likely suffered a concussion in the car accident a few hours earlier.  In his opinion, these impairments "reduc[e] the ability to put forth good judgement."

[2] CJI2d 7.15 is now titled M Crim JI 7.15, and CJI2d 7.16 is now titled M Crim JI 7.16.

However, the trial court refused defense counsel's requests to also give CJI2d 7.16a.[3] Relevant to this case, CJI2d 7.16a would have instructed the jury that if an individual is "in the process of breaking and entering," and the homeowner honestly and reasonably believes that fact, then the jury should presume that the homeowner has an honest and reasonable belief of imminent death or great bodily harm. See MCL 780.951(1). The trial court reasoned that CJI2d 7.16a was inapplicable because "there is no evidence that [the deceased] was either breaking or entering."

Ultimately, the jury found defendant guilty as charged of second-degree murder, MCL 750.317, statutory manslaughter, MCL 750.329, and possession of a firearm during the commission of a felony, MCL 750.227b. The Court of Appeals affirmed his convictions, *People v Wafer*, unpublished per curiam opinion of the Court of Appeals, issued April 5, 2016 (Docket No. 324018), and we directed the Clerk to schedule oral argument on the application, *People v Wafer*, 500 Mich 930 (2017).

## II. STANDARD OF REVIEW

This Court reviews de novo claims of instructional error. *People v Dupree*, 486 Mich 693, 702 (2010).

## III. DISCUSSION

### A. COMMON LAW OF SELF-DEFENSE

"At common law, a claim of self-defense, which 'is founded upon necessity, real or apparent,' may be raised by a nonaggressor as a legal justification for an otherwise intentional homicide." *People v Riddle*, 467 Mich 116, 126 (2002), quoting 40 Am Jur 2d, Homicide, § 138, p 609. "[T]he killing of another person in self-defense is justifiable homicide only if the defendant honestly and reasonably believes his life is in imminent danger or that there is a threat of serious bodily harm and that it is necessary to exercise deadly force to prevent such harm to himself." *Riddle*, 467 Mich at 127. "[O]nce the defendant satisfies the initial burden of production, the prosecution bears the burden of disproving the common law defense of self-defense beyond a reasonable doubt." *People v Reese*, 491 Mich 127, 155 (2012) (quotation marks and citation omitted; alteration in original).

As a general rule under the common law, a person exercising his right of self-defense is "bound, if possible, to get out of his adversary's way, and has no right to stand up and resist if he can safely retreat or escape." *Pond v People*, 8 Mich 150, 176 (1860). However, under the castle doctrine, "[i]t is universally accepted that retreat is not a factor

---

[3] CJI2d is now titled M Crim JI 7.16a.

in determining whether a defensive killing was necessary when it occurred in the accused's dwelling[.]" *Riddle*, 467 Mich at 134. "The rule has been defended as arising from 'an instinctive feeling that a home is sacred, and that it is improper to require a man to submit to pursuit from room to room in his own house.' " *Id*., quoting *People v Godsey*, 54 Mich App 316, 319 (1974) (citations and quotation marks omitted).

## B. STATUTES GOVERNING SELF-DEFENSE

"With the enactment of the Self-Defense Act (SDA), MCL 780.971 *et seq*., the Legislature codified the circumstances in which a person may use deadly force in self-defense or in defense of another person without having the duty to retreat." *Dupree*, 486 Mich at 708. MCL 780.972(1)(a) of the SDA reads as follows:

> (1) An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if either of the following applies:

> (a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual.

MCL 780.972 is consistent with the common law of self-defense to the extent that it allows a person to use deadly force in self-defense when (1) the person honestly and reasonably believes that there is a threat of imminent death or great bodily harm to himself, and (2) the person honestly and reasonably believes that the use of deadly force is necessary to prevent such an outcome.

Furthermore, MCL 780.951 provides heightened statutory protection for a person who uses deadly force in self-defense when the circumstances suggest that another person presents an imminent threat of death or great bodily harm to those within a dwelling. MCL 780.951(1) provides, in relevant part, as follows:

> (1) . . . [I]t is a rebuttable presumption in a civil or criminal case that an individual who uses deadly force or force other than deadly force under [MCL 780.972] has an honest and reasonable belief that imminent death of, sexual assault of, or great bodily harm to himself or herself or another individual will occur if both of the following apply:

> (a) The individual against whom deadly force or force other than deadly force is used is in the process of breaking and entering a dwelling or business premises or committing home invasion or has broken and entered a dwelling or business premises or committed home invasion and is still

present in the dwelling or business premises, or is unlawfully attempting to remove another individual from a dwelling, business premises, or occupied vehicle against his or her will.

(b) The individual using deadly force or force other than deadly force honestly and reasonably believes that the individual is engaging in conduct described in subdivision (a).

Thus, MCL 780.951(1) essentially provides that, when the evidence shows that both subdivisions (a) and (b) have been satisfied, the defendant is entitled to a rebuttable presumption that he possesses an honest and reasonable belief of imminent death or great bodily harm. The trial court here, despite repeated requests from defense counsel, refused to instruct the jury concerning MCL 780.951 by providing the jury CJI2d 7.16a. Its refusal to do so is dominantly at issue in this appeal. Put simply, defendant was *entitled* to such an instruction if the evidence supported both MCL 780.951(1)(a) and (1)(b). See *People v Rodriguez*, 463 Mich 466, 472 (2000) ("[W]hen a jury instruction is requested on any theories or defenses and is supported by evidence, it must be given to the jury by the trial judge.") (quotation marks and citation omitted); *People v Kolanek*, 491 Mich 382, 411-412 (2012) ("[I]f a defendant produces sufficient evidence of the elements of the defense, then the question whether the defendant has asserted a valid defense is for the jury to decide.").

### a. MCL 780.951(1)(a)

In relevant part, MCL 780.951(1)(a) is satisfied when either (1) the individual "is in the process of breaking and entering a dwelling" *or* (2) the individual "has broken and entered a dwelling . . . and is still present in the dwelling . . . ."

To constitute a "breaking," the use of "any force" is sufficient. See *People v White*, 153 Mich 617, 621 (1908) ("[I]f any force at all is necessary to effect an entrance into a building, through any place of ingress, usual or unusual, whether open, partly open or closed, such entrance is a breaking sufficient in law to constitute burglary, if the other elements of the offense are present."). To constitute an "entry," " 'it is sufficient if any part of defendant's body is introduced within the house.' " *People v Gillman*, 66 Mich App 419, 430 (1976), quoting 3 Gillespie, Michigan Criminal Law & Procedure (2d ed), § 1133, p 1528.

MCL 780.951(1)(a) *separately* refers to an individual who is "in the process of breaking and entering" and an individual who "has broken and entered." Under the principle of statutory interpretation that "[c]ourts must give effect to every word, phrase, and clause in a statute," *State Farm Fire & Cas Co v Old Republic Ins Co*, 466 Mich 142, 146 (2002), the phrase "in the process of breaking and entering" must mean something different than "has broken and entered." Otherwise, the first phrase would be nugatory.

The most straightforward meaning of "in the process of breaking and entering," in light of the fact that the statute separately refers to "has broken and entered," is that the breaking and entering must be in progress, although the breaking and entering is not yet complete. With that in mind, it is clear that under one entirely reasonable view of the evidence, the deceased here was "in the process of breaking and entering." Evidence showed that the screen from the screen door had been pushed against the front door when defendant opened it.[4] A reasonable inference, therefore, is that the deceased pushed the screen against the front door to pound on it. That is, the deceased was responsible for dislodging the screen and pushing her hand through the screen door to the front door. Logically, when an entrance to a building is protected by two doors, in order to access the building, the outer door must be broken before the inner door is broken. When a person breaks through the outer door, that person is quite literally "in the process of" breaking and entering the building. Here, assuming that the deceased broke through the screen door to access the front door, as the evidence suggests, she had been *successful* in breaking one of two barriers to the home and thus was "in the process of" breaking and entering. Moreover, as defendant testified, the banging on the doors was exceedingly loud and forceful, to the extent that the peephole was damaged. And other evidence suggested that the deceased had damaged one of her boots and injured her hands as a possible result of her repeated banging on the doors. Certainly, one way to accomplish an entry into a home is to break down the door by the raw application of physical force. Simply put, the evidence, in my judgment, was sufficient to warrant a finding that the deceased was "in the process of" breaking and entering. Accordingly, the evidence showed that MCL 780.951(1)(a) was satisfied.

### b. MCL 780.951(1)(b)

Having concluded that the evidence showed that the deceased may have been "in the process of breaking and entering," thus satisfying MCL 780.951(1)(a), the next question is whether the evidence satisfied MCL 780.951(1)(b). Under MCL 780.951(1)(b), the individual using deadly force must "honestly and reasonable believe[]" that the other individual "is engaging in conduct described in subdivision (a)."

The evidence clearly shows that MCL 780.951(1)(b) was satisfied. Defendant testified that he was in fear, that he believed that the person or persons outside were trying to get inside his home in the middle of the night, and that when he pulled the trigger, it was "them or me." Thus, he had an honest belief that the deceased was "in the process of breaking and entering." Furthermore, that belief was reasonable as well, given

---

[4] In particular, defendant testified that the screen was dislodged inward when he opened it, and another witness testified that the front door had small markings on it that were consistent with the screen pushing against it.

his testimony as to the loud and sustained banging in the middle of the night, his testimony that the banging on the front door was so forceful as to damage the peephole, and his testimony that the screen had been dislodged. It was altogether reasonable under these circumstances, including the recent criminal history of the neighborhood, for an individual to believe that the person or persons outside were in the process of breaking and entering the home. Accordingly, the evidence showed that MCL 780.951(1)(b) was satisfied as well.

Therefore, the evidence satisfied both MCL 780.951(1)(a) and (1)(b), such that defendant was entitled to a jury instruction on the rebuttable presumption set forth in that statute. The trial court, I believe, erred by ruling otherwise.[5]

## C. PRESERVED ERROR

"Preserved, nonconstitutional errors are subject to harmless-error review, governed by MCL 769.26[.]" *People v Lyles*, 501 Mich 107, 117 (2017). Under MCL 769.26, "a defendant carries the burden of showing that 'it is more probable than not that the error was outcome determinative.' " *Id.* at 117-118, quoting *People v Lukity*, 460 Mich 484, 495-496 (1999). For the following five reasons, I conclude that the failure to instruct the jury concerning the rebuttable presumption of MCL 780.951 was outcome-determinative error and, therefore, a new trial is warranted.

First, it is clear that a jury instruction on the rebuttable presumption of MCL 780.951, which concerns "an honest and reasonable belief that imminent death of, sexual assault of, or great bodily harm to himself or herself or another individual will occur," would have squarely supported defendant's theory and undermined the prosecutor's

---

[5] I decline to address the prosecutor's new argument in this Court that MCL 780.951, in a criminal case, merely serves as a mechanism for a defendant to satisfy his initial burden of production concerning one element of self-defense under the SDA. "The general rule is well established that upon appellate review, parties cannot assume a position inconsistent with or different from that taken at the trial and are restricted to the theory upon which the case was defended in the court below." *Heider v Mich Sugar Co*, 375 Mich 490, 506 (1965) (opinion by KELLY, J.). In the trial court, the prosecutor argued that CJI2d 7.16a should not be given because it was not applicable to the particular facts at hand, *not* because MCL 780.951 is a burden-of-production statute. Furthermore, after opening statements, the prosecutor remarkably reached out to the Committee on Model Criminal Jury Instructions and obtained a favorable amendment of CJI2d 7.16a with immediate effect. By doing so, the prosecutor clearly evinced an understanding that the rebuttable presumption of MCL 780.951 was, in fact, appropriate to submit to the jury in certain cases. Under these circumstances, I do not believe that it would be appropriate to entertain the prosecutor's new argument concerning that instruction.

theory with regard to the first element of self-defense set forth in MCL 780.972(1)(a) of the SDA, which requires an honest and reasonable belief of "imminent death or great bodily harm to himself." In addition, a jury that affirmatively found in favor of defendant—as opposed to merely entertained reasonable doubt—as to the first element of self-defense would have also been inclined to find reasonable doubt as to the second element of self-defense set forth in MCL 780.972(1)(a) of the SDA, which requires an honest and reasonable belief "that the use of deadly force is necessary to prevent" that outcome. That is, a jury that found that defendant possessed an honest and reasonable belief of imminent death or great bodily harm would have been substantially more likely to entertain reasonable doubt as to whether he possessed an honest and reasonable belief that the use of deadly force was necessary to prevent such an outcome.

Second, a review of the prosecutor's closing argument shows that he relied heavily on the theory that defendant was angry and frustrated, not afraid, when he confronted the apparent would-be intruder:

> Yet she ended up in the morgue. With bullets in her head and in her brain. Because the defendant picked up this shotgun, released this safety, raised it at her, pulled the trigger and blew her face off. He heard knocks and he was mad.

> He was angry. And he was full of piss and vinegar. And he was gonna find out what's going on. And he took that shotgun, while mad, angry and full of piss and vinegar to find out what's going on.

> Why? Why? Why? Because some kids paint balled his car a few weeks earlier. Because he was fed up with the knocking. Why? Why?

> He wanted a confrontation. He wanted the kids, the neighborhood kids to leave him alone. He wanted to show them a shotgun. Because he had had enough. Enough of the drug paraphernalia on his front yard.

> Enough of the paint ball. Enough of the kids doing whatever to him. And he went and took a shotgun, in his words, to show it to 'em and scare them away.

> Now the sound's back at the front door. I've had enough. I'm going to find out what's going on. He goes to where the sound is with the shotgun. He wants a confrontation.

> And what he finds is a 19 year old unarmed teenager. Wet, probably cold, scared, disoriented, possible closed head injury. And based on the

> evidence in this case and the reasonable inferences, looking for help. He raised up his gun at that person and shot her in the face.

> \* \* \*

> He wanted to show the shotgun. He opened the door a bit. Then he opened it all the way. He saw a person. At that point he raised it up, he raised up the shotgun.

> He may have even stopped and said something. Not sure what I said, because now I'm piss [sic] and mad. Not scared. Now I'm mad.

Simply put, the prosecutor argued that defendant was angry and aggressive, not fearful for his own life. But anger and aggression are not necessarily inconsistent with a belief that one's life is in danger.[6] It is entirely possible that an individual such as defendant could be angry that the sanctity of his home was being violated, *and* sufficiently aggressive to affirmatively confront the situation, while still believing that his life is in danger. An individual can have a wide variety of reactions to believing that his or her life is being threatened, including anger, fear, resignation, and so forth. But so long as the *belief* is present, the *particular* emotional reaction to that belief is inconsequential. One need not react timidly or tentatively or by cowering in the face of the circumstances confronting defendant in this case in order that his response not be characterized as "angry and aggressive" rather than "fearful." Through MCL 780.951, the Legislature has expressed its intention that an individual who is confronted with a breaking and entering is entitled to additional legal protection concerning his *belief* of imminent death or great bodily harm. The jury should have been informed of that presumption, which would have necessarily made it much more difficult for the prosecutor to utilize defendant's asserted emotional reaction to assert that he did not possess such a belief beyond a reasonable doubt.

In addition, the prosecutor argued that the jury should find defendant guilty because he did not flee to a different part of the house:

> How about shutting the door. How about keeping it shut. How about calling 911. *How about going into a different part of your house.* That's not retreating. *But going to a different part of your house.* [Emphasis added.]

The contention that "going to a different part of your house" is not tantamount to "retreating" is clearly a misstatement of the castle doctrine. See *Riddle*, 467 Mich at 134. By so arguing to the jury, however, the prosecutor encouraged the jury to find that

---

[6] Indeed, MCL 780.972(1)(a) of the SDA does not use the word "fears." Rather, it uses the word "believes." Fear is not a requirement for lawful self-defense.

defendant did not possess an honest and reasonable belief of imminent death or great bodily harm because he did not go to a different part of the house. Had the jury been instructed on the rebuttable presumption of MCL 780.951, defendant would have been protected against such an improper argument.

Third, I find it difficult to believe that the jury found beyond a reasonable doubt that defendant did not act in self-defense when the apparent would-be intruder rushed toward the front door in the middle of the night, and he instinctively pulled the trigger of the shotgun in response. Instead, given the prosecutor's closing argument, the jury likely identified as absolutely critical the fact that defendant opened the front door to confront the would-be intruder or intruders, rather than staying behind closed doors. Instructing the jury on the rebuttable presumption of MCL 780.951 would have explicitly informed the jury that an individual who is in the process of breaking and entering may pose an imminent threat to the homeowner inside. Making that information explicit would have meant that the jury was required to presume, at all times relevant to this case, that defendant possessed an honest and reasonable belief of imminent death or great bodily harm unless rebutted by the prosecutor. Thus, the jury would have presumed that *before, during, and after* defendant opened the front door, he possessed such a belief. The only remaining question would then have been whether defendant possessed an honest and reasonable belief that "the use of deadly force [was] necessary to prevent the imminent death or great bodily harm." MCL 780.972(1)(a). If the jury's focus had been on that moment in time when the apparent would-be intruder rushed toward defendant, it would have been almost impossible to escape the conclusion that he had used necessary deadly force or, at a minimum, that there had been a reasonable doubt as to whether he had used necessary deadly force. In my view, it is only because the prosecutor was able to expand the jury's focus to the time before defendant opened the door that he was able to obtain a conviction. That time frame, however, was virtually irrelevant as to whether defendant had used "necessary" deadly force, given that defendant had no duty to retreat in his dwelling, which included the porch. See *People v Richardson*, 490 Mich 115, 121 (2011).

Fourth, the jury was instructed that "a person is [n]ever required to retreat if attacked in his home," which includes the "porch." The negative implication of this instruction was that defendant *himself* must be attacked in his home for the duty to retreat no longer to be a relevant concept. But the castle doctrine is not so limited. Rather, under the castle doctrine, the duty to retreat is simply not a relevant concept when, in addition to such circumstances, an individual is attempting an unlawful entry into the dwelling. See *Pond*, 8 Mich at 177 ("A man is not, however, obliged to retreat if assaulted in his dwelling, but may use such means as are absolutely necessary to repel the assailant from his house, *or to prevent his forcible entry*, even to the taking of life.") (emphasis added). And that is precisely what the facts showed here.

For this reason, I respectfully disagree with the Court of Appeals that the failure to instruct the jury concerning MCL 780.951 constituted harmless error because the jury found defendant guilty, thereby rejecting his self-defense argument beyond a reasonable doubt. See *Wafer*, unpub op at 4 n 2 ("[T]here was scant evidence of self-defense while, in contrast, the jury received detailed instructions on defendant's self-defense theory and the prosecutor presented ample evidence to disprove defendant's claim of self-defense beyond a reasonable doubt."). Even if the presumption *itself* might not have affected the case, instructing the jury concerning MCL 780.951 would have assisted the jury in understanding that the duty to retreat simply is not implicated when the apparent would-be intruder is attempting to break through the doors of the home. Absent such an instruction, the jury was essentially informed of the opposite: that the duty to retreat *is* a relevant concept in such circumstances.

Fifth, during her opening statement, defense counsel discussed CJI2d 7.16a and told the jury that it should presume that defendant "had an honest and reasonable belief that imminent death or great bodily harm would occur" if "[t]he deceased was breaking and enter[ing] a dwelling." However, defense counsel was unable to offer such an argument during her closing argument because the trial court had refused to instruct the jury concerning MCL 780.951. Given this discrepancy between the opening statement and closing argument, the jury was left either with the impression that the evidence introduced at trial did not show that defendant had an honest and reasonable belief that imminent death or great bodily harm would occur, or else failed to show that the deceased was in the process of breaking and entering, or both; otherwise, the jury would have received a final instruction consistent with the opening statement. In either event, defendant was prejudiced. If the jury was left with the first impression, defendant was prejudiced because he did, in fact, introduce evidence showing that he honestly and reasonably believed that imminent death or great bodily harm would occur to him, and the jury should not have been implicitly informed to preemptively disregard such evidence during its deliberations. If the jury was left with the second impression, defendant was prejudiced because whether the deceased was in the process of breaking and entering was undoubtedly a critical issue in this case, and the jury should not have been implicitly informed that the dispute had been resolved in favor of the prosecutor.

For these reasons, I conclude that the failure to instruct the jury concerning MCL 780.951 was not harmless error, and consequently, a new trial is warranted.

## IV. DEFENSE OF HABITATION

Notwithstanding my conclusion that a new trial is warranted because of the erroneous failure to instruct the jury concerning MCL 780.951, my review of the record indicates that another error occurred at trial. This error, in my judgment, provides an *independent* basis for a new trial.

Under the common law, in addition to self-defense, a person within a dwelling could also avail himself of the defense of habitation in cases such as the instant case. See generally, 4 Blackstone, Commentaries on the Laws of England, p *180 ("If any person attempts a robbery or murder of another, or attempts to break open a house, *in the night-time*, (which extends also to an attempt to burn it), and shall be killed in such attempt, the slayer shall be acquitted and discharged."). One scholar has explained the distinction between these two defenses as follows:

> As an exception to the generalized duty to retreat, the Castle Doctrine sits at the intersection of two distinct but interrelated defenses: defense of habitation and self-defense. Defense of habitation is primarily based on the protection of one's dwelling or abode, and stems from the common law belief that a man's home is his castle. Essentially, the defense provides that the use of deadly force may be justified to prevent the commission of a felony in one's dwelling, although there is considerable discussion on whether the intrusion must be accompanied by the intent to commit a violent felony. Some courts require that defense of habitation only be asserted as against an external threat, and if that is true, then the defense cannot be claimed as against a cohabitant in lawful possession. Because the threat is of the commission of a forcible felony in the home, courts agree that there is no duty to retreat when claiming the defense of one's habitation. As stated forcefully by the Minnesota Supreme Court, "[m]andating a duty to retreat for defense of dwelling claims will force people to leave their homes by the back door while their family members are exposed to danger and their houses burgled."

> Derived from similar roots, and potentially overlapping, is self-defense in the home. Whereas in defense of habitation, deadly force may be used to prevent the commission of an atrocious felony, in self-defense, deadly force may be used when necessary in resisting or preventing an offense which reasonably exposes the person to death or serious bodily harm. The contemplated need for self-defense in the home, therefore, is in some sense broader—it can be an external or internal attack—but it is narrower in its requirement that the attacker intends death or serious bodily harm. [Carpenter, *Of the Enemy Within, the Castle Doctrine, and Self-Defense*, 86 Marq L Rev 653, 665-666 (2003) (citations omitted).]

This Court has recognized the distinction between these two defenses. See *People v Gonsler*, 251 Mich 443, 445 (1930) ("The defense of life or limb *or* of [the

homeowner's] habitation was not involved if the dying declaration was true.") (emphasis added).[7]

The seminal case in Michigan concerning defense of habitation is *Pond*. The pertinent facts of *Pond* were as follows:

> Pond went to the door and hallooed, "Who is tearing down my net-house?" to which there was no answer. The voices of a woman and child were heard crying, and the woman's voice was heard twice to cry out "for God's sake!" Cull's voice was also heard from the net-house, not speaking, but hallooing as if he was in pain. Pond cried out loudly, "Leave, or I'll shoot." The noise continuing, he gave the same warning again, and in a few seconds shot off one barrel of the gun. Blanchard was found dead the next morning. [*Pond*, 8 Mich at 180-181.]

This Court reversed Pond's conviction because had he properly used deadly force in defending the net-house, which comprised part of his dwelling, from attack:

> A question was raised whether the net-house was a dwelling or a part of the dwelling of Pond. We think it was. . . .
>
> * * *
>
> Apart from its character as a dwelling, which was denied by the court below, *the attack upon the net-house for the purpose of destroying it, was a violent and forcible felony*. And the fact that it is a statutory and not common law felony, does not, in our view, change its character. Rape and many other of the most atrocious felonious assaults, are statutory felonies only, and yet no one ever doubted the right to resist them unto death. *And a breaking into a house with the design of stealing the most trifling article, being common law burglary, was likewise allowed to be resisted in like manner, if necessary*. [*Id*. at 181-182 (emphasis added).]

"We think there was error . . . in holding that the protection of the net-house could not be made by using a dangerous weapon . . . ." *Id*. at 182.

---

[7] More recently, in *Riddle*, this Court implicitly recognized that self-defense and defense of habitation are separate defenses. When agreeing with the prosecutor's assertion that "*Pond* did not in any way purport to extend the self-defense castle exception to the curtilage area surrounding the dwelling," we explained that "*Pond* considered the net-house to be a dwelling not for the purpose of the self-defense castle doctrine but instead for the purpose of *a completely different defense* . . . ." *Riddle*, 467 Mich at 136 & n 27 (emphasis added). That "completely different defense," as explained herein, was the defense of habitation.

Thus, *Pond* establishes that, wholly distinct from self-defense, deadly force may be used for defense of habitation when the assailant against the habitation apparently possesses the "design" (i.e., the intent) to commit a felony therein. See *id.* And furthermore, that felony to be committed need not itself be violent. Rather, "stealing the most trifling article" is sufficient. See *id.* See also 3A Gillespie, Michigan Criminal Law & Procedure (2d ed), § 91:58, Defense of Habitation, p 376 ("*Force, including deadly force, may be used to* repel an intruder or *prevent forcible entry* into a dwelling where under the circumstances the occupant would reasonably believe the intruder intended to commit a felony or to do serious bodily harm.") (emphasis added).[8]

Consistent with this common law is Michigan Criminal Nonstandard Jury Instruction § 25:8, titled "Defenses—Habitation," which reads as follows:

(1) The defendant contends that the killing (use of deadly force, in the event death is not caused by use of force) was justified because it occurred under circumstances entitling [him/her] to use deadly force to prevent forcible entry into [his/her] dwelling, under circumstances where the defendant would reasonably believe the intruder intended to commit a felony or do serious bodily harm to one within the dwelling.

(2) If you have a reasonable doubt as to whether the defendant did indeed use deadly force against the intruder in an attempt to prevent forcible entry into [his/her] dwelling, under circumstances where the defendant would reasonably believe the intruder intended to commit a felony, or do serious bodily harm to one within the dwelling, then the defendant is not guilty of any crime.

(3) An individual is entitled to use deadly force to prevent forcible entry into [his/her] dwelling, under circumstances where the defendant would reasonably believe the intruder intended to commit a felony, or do

---

[8] Footnote 11 of *Riddle* is consistent with this proposition. There, this Court stated that "[w]e specifically do not address whether a person may exercise deadly force in defense of his habitation, and our holding should not be misconstrued to sanction such use of force as it pertains to the defense of one's habitation." *Riddle*, 467 Mich at 121 n 11. Aside from the fact that this Court expressly declined to address the question of defense of habitation, it is certainly true that deadly force may not be used when a person is *only* seeking to defend his habitation. Rather, the assault against the habitation must be accompanied by circumstances indicating that the assailant intends to commit a felony therein.

serious bodily harm to one within the dwelling, only when all of the following circumstances exist:

(A) The evidence must show that a forcible intrusion into the dwelling was occurring.

(B) The evidence must show that the forcible intrusion was occurring under circumstances where it would be reasonable for an occupant to believe the intruder intended to commit a felony or do serious bodily harm to one within the dwelling; the use of deadly force is not permissible to expel a mere trespasser.

(C) The evidence must show that the defendant thus entertained an honest and reasonable belief that the use of deadly force was necessary to prevent the intruder from committing a felony or doing serious bodily harm to one within the dwelling.

(4) The defendant does not have to prove that [he/she] acted in defense of [his/her] dwelling. Instead, the prosecutor must prove beyond a reasonable doubt that the defendant did not act in defense of [his/her] dwelling.

(5) Whether the evidence raises a reasonable doubt that, under these standards, the defendant was justified in using deadly force to defend [his/her] dwelling, is a question you must determine. [Murphy & VandenHombergh, *Michigan Nonstandard Jury Instructions—Criminal* (Eagan: Thomson Reuters, 2017), pp 388-389 (italics omitted).]

In my judgment, this jury instruction sets forth the common law of defense of habitation in Michigan with reasonable precision. Moreover, Comment 2 to this instruction in particular provides a thoughtful explanation of the distinction between self-defense and defense of habitation:

Defense of habitation is a different defense from self-defense, and differs from protection of other property. The dwelling is viewed as a place of special importance as a place of security, and thus defense of the dwelling permits the use of deadly force where the defender reasonably believes that the trespasser or intruder intends to commit a felony or to do harm to him or her or another within the house. *Unlike the defense of self-defense, it is not required that the defendant be in fear of imminent death or great bodily harm at the time deadly force is employed, as is required with self-defense*. [*Id*. at 389-390 (emphasis added).]

I am unable to locate any place in the instant record where defense counsel requested that the trial court give Michigan Criminal Nonstandard Jury Instruction § 25:8—or other instruction concerning the defense of habitation—to the jury.[9] If defense counsel failed to do so, her failure arguably fell below an objective standard of reasonableness. See *Strickland v Washington*, 466 US 668 (1984). I can identify no trial strategy that would justify the failure to request that the trial court provide an instruction concerning a defense that is squarely applicable to the case and is arguably more likely to be successful than any other defense that might be argued. Once again, defense of habitation simply does not require that the defendant possess a belief of imminent death or great bodily harm. Rather, the defendant is only required to possess a belief that a forcible intrusion is occurring and that the intruder intends to commit a felony inside the habitation. Thus, an instruction concerning the defense of habitation would have fundamentally undermined the prosecutor's case, which was premised upon the notion that defendant should be found guilty because he did not possess a belief of imminent death or great bodily harm. Furthermore, defense of habitation allows the defendant to repel a forcible intrusion *before* it is successful. See *Pond*, 8 Mich at 181-182.[10] Thus, an instruction concerning the defense of habitation would also have undermined the prosecutor's case to the extent that it relied on the notion that defendant should not even have opened the front door to confront the would-be intruder.

Such an instruction, if requested, should have been given by the trial court. The evidence showed that the deceased had broken through the screen door as a result of her pounding and banging. Thus, a forcible intrusion into the dwelling was occurring. Furthermore, given that the assault against the dwelling was occurring in the middle of the night in a relatively high-crime neighborhood, it was, in my judgment, reasonable for defendant to believe that the assailant intended to commit a felony therein. See, e.g., MCL 750.360 ("Any person who shall commit the crime of larceny by stealing in any

---

[9] Michigan Criminal Nonstandard Jury Instruction § 25:8 was listed as Michigan Criminal Nonstandard Jury Instruction § 25.9 before 2014.

[10] Michigan is hardly alone in this regard. See, e.g., *State v Blue*, 356 NC 79, 87 (2002) (explaining that "the use of deadly force in defense of the habitation is justified only to *prevent* a forcible entry into the habitation under such circumstances . . . that the occupant reasonably apprehends death or great bodily harm . . . or believes that the assailant intends to commit a felony") (quotations marks and citation omitted; emphasis in original); *State v Ivicsics*, 604 SW2d 773, 777 (Mo App, 1980) (explaining that defense of habitation "differs from self defense by authorizing protective acts to be taken earlier than they otherwise would be authorized, that is, at the time when and place where the intruder is seeking to cross the protective barrier of the house") (quotation marks and citation omitted).

dwelling house . . . shall be guilty of a felony."). And defendant further testified that this was his honest belief as well.

I have little doubt that such an instruction likely would have changed the outcome of the trial. Even if the jury found beyond a reasonable doubt that the prosecutor disproved self-defense, the jury still would have been obligated to acquit defendant if a forcible intrusion was occurring, it was reasonable to believe that the assailant of the dwelling intended to commit a felony therein, and defendant possessed an honest and reasonable belief of this fact. Given the significant evidence supporting each of these facts, an acquittal would have been almost inevitable.

Regardless of whether defense counsel raised the issue concerning defense of habitation in the trial court, the trial court failed to give any such instruction to the jury. Appellate counsel, in my judgment, should have argued on direct appeal that the instruction should have been given and, if appropriate, that defense counsel was ineffective for failure to so argue. This may well have constituted ineffective assistance of appellate counsel. Accordingly, in a motion for relief from judgment, I believe that defendant would be able to show both "good cause" for failure to raise the issue concerning defense of habitation on direct appeal, see MCR 6.508(D)(3)(a), and "actual prejudice" from the failure to instruct the jury on this defense, see MCR 6.508(D)(3)(b).

## V. CONCLUSION

In the end, the fundamental question here is whether the alleged instructional error concerning the rebuttable presumption of MCL 780.951 warrants reversal. I believe that it does. Defendant was deprived of the legal *presumption* to which he was entitled by statute, that he acted in self-defense out of an honest and reasonable belief of imminent death or great bodily harm when the deceased apparently tried to break down the doors of his home in the middle of the night. Had the jury *presumed* that he possessed such a belief, it would have been far more likely to find that the prosecutor did not disprove self-defense beyond a reasonable doubt.

It is altogether tragic that Renisha McBride lost her life. However, I do not believe that defendant is properly held responsible, or that he *would* have been held responsible, but for the trial court's failure to properly instruct the jury concerning the full gravity of the situation faced by defendant. Accordingly, I respectfully dissent.

CLEMENT, J., did not participate in the disposition of this matter because the Court considered it before she assumed office.



I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

March 9, 2018



Clerk

t0306